# EXHIBIT A

 **CT Corporation**

**Service of Process Transmittal**
06/04/2019
CT Log Number 535609653

TO: LYNN GOMPPER
JOHNSON CONTROLS, INC.
5757 N GREEN BAY AVE
MILWAUKEE, WI 53209-4408

RE: **Process Served in New Jersey**

FOR: Tyco Fire Products L.P.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | GURBIR S. GREWAL, et al., Pltfs. vs. THE 3M COMPANY, et al., Dfts. // To: Tyco Fire Products L.P. |
| **DOCUMENT(S) SERVED:** | SUMMONS, COMPLAINT, ATTACHMENT(S) |
| **COURT/AGENCY:** | Mercer County - Superior Court, NJ
Case # MERL00095319 |
| **NATURE OF ACTION:** | Environmental Litigation |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, West Trenton, NJ |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/04/2019 at 13:36 |
| **JURISDICTION SERVED :** | New Jersey |
| **APPEARANCE OR ANSWER DUE:** | Within 35 days from the dale you received this Summons, not counting the date you received it. |
| **ATTORNEY(S) / SENDER(S):** | Gurbir S. Grewal
25 Market Street
PO Box 093
Trenton, NJ 08625
(609) 376-2761 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/05/2019, Expected Purge Date: 06/10/2019

Image SOP

Email Notification,  ELAYNE MOZEN  elayne.mozen@jci.com

Email Notification,  LYNN GOMPPER  lynn.m.gompper@jci.com |
| **SIGNED:**
**ADDRESS:**

**TELEPHONE:** | The Corporation Trust Company
820 Bear Tavern Road
3rd Floor
West Trenton, NJ 08628
609-538-1818 |

Page 1 of  1 / AS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, NJ 08625-0093
Tel.:   (609) 376-2761
By:    Gwen Farley, Deputy Attorney General
        Gwen.Farley@law.njoag.gov
        Atty. ID #000081999
*Attorneys for Plaintiffs*

Leonard Z. Kaufmann
  Atty. ID #045731994
  lzk@njlawfirm.com
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.:   (201) 845-9600
*Special Counsel to the Attorney General*

| | |
|---|---|
| GURBIR S. GREWAL, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and PAUL R. RODRÍGUEZ, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  MERCER COUNTY DOCKET NO.:  MER-L-000953-19 |
| *Plaintiff(s),* | Civil Action |
| v. | **SUMMONS** |
| THE 3M COMPANY; TYCO FIRE PRODUCTS LP; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; E.I. DUPONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; and "ABC CORPORATIONS" 1-10 (Names Fictitious), | |
| *Defendant(s).* | |

FROM THE STATE OF NEW JERSEY, To The Defendant(s) Named Above:

        The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey.    The complaint  attached to this summons states the basis for this lawsuit.   If you dispute this complaint, you or your attorney must file a  written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within  35 days from the date you received this summons, not counting the date you received it.   (A directory of the addresses of  each deputy clerk of the Superior Court is available in the Civil Division Management Office in the

county listed above and online at http://www.judiciary.state.nj.us/pro se/10153 deptyclerklawref.pdf.)    If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971.    A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed.    You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529).    If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.    A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153 deptyclerklawref.pdf.

Dated:    May 15, 2019                        /s Michelle M. Smith, Esq.
                                             Clerk of the Superior Court

Name of Defendant to be served:             Tyco Fire Products LP
Address of Defendant to be served:          c/o The Corporation Trust Company
                                             820 Bear Tavern Road
                                             West Trenton, NJ 08628

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, NJ 08625-0093
Tel.: (609) 376-2761
By:  Gwen Farley, Deputy Attorney General
     Gwen.Farley@law.njoag.gov
     Atty. ID #000081999
*Attorneys for Plaintiffs*

Leonard Z. Kaufmann
  Atty. ID #045731994
  lzk@njlawfirm.com
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
*Special Counsel to the Attorney General*

| | |
|---|---|
| GURBIR S. GREWAL, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and PAUL R. RODRÍGUEZ, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, <br><br> Plaintiffs, <br><br> v. <br><br> THE 3M COMPANY; TYCO FIRE PRODUCTS LP; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; E.I. DUPONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; and "ABC CORPORATIONS" 1-10 (Names Fictitious), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION <br><br> MERCER COUNTY <br><br> DOCKET NO. _____ <br><br><br> CIVIL ACTION <br><br><br> **COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs, Gurbir S. Grewal, Attorney General of New Jersey (the "Attorney General"), the New Jersey Department of Environmental Protection ("NJDEP"), and Paul R. Rodríguez, Acting Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs") file this Complaint against the above-named defendants ("Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1.    NJDEP brings this civil action against Defendants pursuant to the common law of New Jersey for injuries to natural resources of the State of New Jersey ("New Jersey" or "State"), including groundwater, surface water, sediments, soils, and biota, as a result of releases of perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") into the environment due to the use, handling, and storage of Defendants' aqueous film-forming foam ("AFFF") products.    PFOS and PFOA are two persistent, bioaccumulative, and toxic substances within the class of man-made chemicals known as per- and polyfluoroalkyl substances ("PFAS"). Defendants' AFFF products were used at various locations throughout New Jersey, causing widespread contamination of the State's natural resources with PFOS and PFOA.

2.    Additionally, the Attorney General and the Director bring this action against Defendants pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -210 (the "CFA"), based on

2

Defendants' deceptive and fraudulent business practices in connection with their advertisement, offer for sale, and sale of AFFF to New Jersey State government entities, counties, municipalities, and local fire departments. Affected entities include county fire training academies as well as potentially hundreds of local fire departments that purchased and used these products in their performance of important public services, but were deceived by Defendants about the risks posed by AFFF, and have been left to deal with the consequences. The Attorney General and the Director are thus seeking civil penalties based on Defendants' conduct, as well as restitution for these entities.

3.    AFFF is a product used to fight fuel and other flammable liquid fires. When the AFFF concentrate is mixed with water, a foam solution is formed. The foam is sprayed onto fire to produce an aqueous film, which blocks the fire's supply of oxygen, generates a cooling effect, creates an evaporation barrier, and prevents re-ignition.

4.    Defendants designed, manufactured, marketed, and sold AFFF throughout the United States, including in New Jersey. These AFFF products contained PFOS, PFOA, and/or their precursors (i.e., substances that break down in the environment into PFOS or PFOA). When used, the AFFF products thus released PFOS and PFOA into the environment. At all times relevant, Defendants together

3

controlled all, or substantially all, of the market in New Jersey for AFFF products.

5.    PFOS and PFOA present a significant threat to New Jersey's environment and residents.    They are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.    PFOS and PFOA are also associated with a laundry list of adverse health effects in humans.    PFOS is associated with immune system suppression, including decreases in antibody responses to vaccines and increases in risk of childhood infections.    PFOA is associated with, among other things, high cholesterol, increased liver enzymes, pregnancy-induced hypertension, and testicular and kidney cancer.

6.    Confronted with PFOS and PFOA contamination, New Jersey has acted to regulate these contaminants of emerging concern.    On March 13, 2019, NJDEP established interim specific groundwater criteria for PFOS and PFOA of 10 parts per trillion ("ppt").    In addition, NJDEP has proposed rules establishing maximum contaminant levels and groundwater quality standards for PFOS of 13 ppt and for PFOA of 14 ppt.

7.    Since the creation of AFFF in the 1960s, Defendants have sold their AFFF products to military and industrial facilities, airports, firefighting training academies, and local fire departments in New Jersey and elsewhere.    These entities used

4

Defendants' AFFF products as they were intended to be used and in a foreseeable manner, which introduced PFOS and PFOA into the environment and contaminated New Jersey's natural resources. As a reference, a single firefighting training event can release thousands of gallons of foam-laced water into the environment.

8. Defendants were fully aware, for decades, of the toxic nature of PFOS and PFOA and the harmful and negative impact these substances have on the environment, wildlife, and human health. Nevertheless, they continued to manufacture, market, and sell their AFFF products in New Jersey and elsewhere, and concealed the threat associated with use of their products.

9. Investigation of AFFF-related contamination in New Jersey is ongoing. Presently, sites identified with PFOS and/or PFOA contamination attributable to AFFF include several military facilities, such as Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties ("JB MDL"), Naval Weapons Station Earle in Monmouth County, and the Naval Air Warfare Center in Trenton, as well as a research facility and airport, the Federal Aviation Administration William J. Hughes Technical Center in Atlantic County ("FAA Technical Center"). As investigation continues, it is expected that widespread contamination from use, handling, and storage of AFFF products will be uncovered in New Jersey.

10. Accordingly, this action seeks to require Defendants to pay all costs necessary to fully investigate the various locations

5

throughout New Jersey where their AFFF products were transported, stored, used, handled, released, spilled, and/or disposed, as well as all areas affected by their AFFF.

11. Likewise, this action seeks to require Defendants to pay all costs necessary to investigate, remediate, assess, and restore the sites in New Jersey where their AFFF was transported, stored, used, handled, released, spilled, and/or disposed, as well as all of the off-site areas and natural resources that have been contaminated by their AFFF.

12. Further, in addition to the resources needed to remediate AFFF-related contamination, the New Jersey governmental entities that purchased these products are now forced to spend additional money to properly dispose of AFFF stockpiles. These costs are rightfully borne by Defendants, and are thus sought through this action, as well.

13. Finally, Plaintiffs also seek from Defendants all damages that Plaintiffs are entitled to recover, including damages for injuries to all of the State's natural resources, property damages to State and local government-owned properties, economic damages, restitution and disgorgement of Defendants' ill-gotten profits, punitive damages, and all other damages, fees, costs, and equitable relief to which they may be entitled.

## THE PARTIES

14. NJDEP is a principal department within the Executive

Branch of the State government.    Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.    N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

15.    The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction.    NJDEP is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State.    N.J.S.A. 58:10-23.11a.    In addition, the State may act in its parens patriae capacity to protect the State's "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its natural resources.    NJDEP brings this case in its trustee, parens patriae, and regulatory (police power) capacities.

16.    Plaintiff Attorney General is the chief law enforcement officer and chief legal officer of the State, and is charged with, among other things, the responsibility of enforcing the CFA. Plaintiff Director is charged with the responsibility of administering the CFA on behalf of the Attorney General.

17.    Defendant The 3M Company ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.    On information and belief, 3M has

7

designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, handled, used, released, spilled, and/or disposed in New Jersey. Based on a preliminary survey of local fire departments in New Jersey, at least 80 local fire departments maintain stockpiles of 3M's AFFF products, totaling thousands of gallons of stockpiled AFFF containing PFOS, PFOA, and/or their precursors.

18. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. On information and belief, Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (collectively, "Tyco/Ansul"). On information and belief, Tyco/Ansul has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

19. Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. On information and belief, Chemguard has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors, and/or has

supplied the materials to manufacture AFFF products containing PFOS, PFOA, and/or their precursors, that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

20.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.  On information and belief, Buckeye has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

21.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101.  On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").  On information and belief, Kidde/Kidde Fire has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.  Among other things, in or around 2004 and 2005, Kidde/Kidde Fire sold tens of thousands of gallons

9

of its AFFF products to New Jersey State entities, which in turn were distributed to counties and local fire departments for storage and use.

22.    Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.  On information and belief, National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire").  On information and belief, National Foam/Angus Fire has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

23.    Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  On information and belief, DuPont has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors, and/or supplied the materials to manufacture AFFF products containing PFOS, PFOA, and/or their precursors, that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

10

24.    Defendant The Chemours Company ("Chemours") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899. In 2015, DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. On information and belief, Chemours has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

25.    Defendants represent all or substantially all of the New Jersey market for AFFF products.

### AFFECTED NATURAL RESOURCES

26.    The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust or otherwise controlled by the State. N.J.S.A. 58:10-23.11b.

27.    The natural resources of this State include the "waters of the State," which are the ocean and its estuaries, all springs, streams and bodies of surface or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction. N.J.S.A. 58:10A-3(t).

28.    For purposes of this Complaint, natural resources of this State do not include those natural resources on or underlying

11

federally-owned property, such as military facilities. Likewise, through this Complaint, NJDEP is not seeking relief at the Chemours and/or DuPont facilities at Chambers Works, Parlin, Pompton Lakes or Repauno, which are the subject of separate, site-specific litigation.

29. New Jersey's habitats and ecosystems—lakes, rivers, forests, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—are some of the most threatened in the nation. They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

30. PFOS and PFOA attributable to AFFF have been found in groundwater, surface water, sediments, soils, biota, and other natural resources around presently identified sites where AFFF was transported, stored, used, handled, released, spilled and/or disposed. Further AFFF-related contamination to natural resources will be uncovered as investigation continues.

31. These natural resources have intrinsic (i.e., inherent existence) values. The current and future residents of New Jersey have a right to a clean environment.

Groundwater

32. Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Jersey. More than half of New Jersey's population

12

obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

33.. Private wells, which provide access to groundwater, are used in residential communities surrounding military and industrial facilities, airports, and firefighting training academies where AFFF was transported, stored, used, released, spilled and/or disposed.   Wells are used for drinking water, irrigation, and filling swimming pools, among other things.

34.  Further, not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem.   Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

35.  Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents salt water intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

36.  Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

37.  AFFF is a significant source of PFOS and PFOA contamination in groundwater.

38.  Investigations at military facilities in New Jersey have revealed elevated levels of PFOS and PFOA in groundwater at and

13

surrounding those facilities, which include JB MDL, Naval Weapons Station Earle, and the Naval Air Warfare Center. Groundwater surrounding these facilities is used for, among other things, private wells supplying drinking water.

39. Investigations at the FAA Technical Center have also revealed significant AFFF-related groundwater contamination. Groundwater samples collected in a former firefighting training area included concentrations of PFOS up to 95,000 ppt and PFOA up to 41,000 ppt. The Atlantic City Municipal Utilities Authority ("ACMUA") maintains production wells on FAA Technical Center property, which have been impacted by this contamination.

40. Investigation of AFFF-related contamination in groundwater in New Jersey is ongoing.

### Surface Water

41. Surface waters are a critical ecological resource of New Jersey. New Jersey's surface water—which includes all water in the State's lakes, streams, and wetlands—is a primary source of drinking water in the State. Nearly half of New Jersey's population obtains its drinking water from surface water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

42. Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of

14

goods and services.

43.    The tourism and recreation industries, which are vital to the State's economy, are dependent on clean waters and beaches.

44.    Significant PFOS and PFOA contamination attributable to AFFF has been found in surface water used for fishing and recreation, as well as for drinking water supplies.

45.    In 2018, NJDEP released a study of 11 waterways in New Jersey concerning PFAS, titled Investigation of Levels of Perfluorinated Compounds in New Jersey Fish, Surface Water, and Sediment ("2018 Waterways Study").    Three surface water bodies surrounding and receiving drainage from JB MDL—specifically, Little Pine Lake, Mirror Lake, and Pine Lake—were included in the 2018 Waterways Study.    The results of the study showed significant injuries.    Little Pine Lake, Mirror Lake, and Pine Lake had the highest concentrations of total PFAS (up to 279.5 ppt) and PFOS (up to 102 ppt) in the study.

46.    Additionally, AFFF-related contamination has reached surface water bodies serving as drinking water supplies.    Surface water reservoirs that are the drinking water supplies for the ACMUA, for example, have numerous PFAS, and elevated levels of PFOS and PFOA.

47.    Investigation of AFFF-related contamination in surface water is ongoing.

## Sediments and Soils

48.   New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

49.   Sediments and soils are a critical component of New Jersey ecological resources.

50.   Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem.  They provide a living substrate for submerged and emergent flora and support diverse invertebrate species, wading birds, and fish and shellfish populations.

51.   Sediments and soils serve as a long-term reservoir of PFAS, where PFAS are stored and released over time, impacting biota and increasing PFAS concentration in fish tissue and wildlife.

52.   PFOS contamination attributable to AFFF has been found in sediments.   The 2018 Waterways Study found elevated concentrations of PFOS sediments in Little Pine Lake, Mirror Lake, and Pine Lake.   PFOS in sediments, as well as surface water, increases PFOS concentrations in fish.

53.   Investigation of AFFF-related contamination in sediments and soils in New Jersey is ongoing.

## Biota

54.   Biota, including the flora and fauna of the State, are critical ecological resources.  New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora

16

that cannot be found anywhere else in the world. Approximately 15 percent of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species lists as endangered and an additional 32 that have already been extirpated.

55. New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds. Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers in the State each year.

56. At least 17 percent of New Jersey's native vertebrate species and 24 percent of its native invertebrate species are at risk of extinction. Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

57. New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

58. Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

59. Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate

17

and sustain such life into the future.

60.    AFFF-related contamination has prompted NJDEP to issue consumption advisories for various species of fish.    Through the 2018 Waterways Study, consumption advisories were issued for yellow perch, largemouth bass, pumpkinseed, American eel, and bluegill sunfish in Little Pine Lake, Mirror Lake, and Pine Lake, based on concentrations of PFOS in fish tissue.    PFOS concentrations in species at some locations was severe enough that NJDEP issued consumption advisories for the general population of once per year (i.e., only one meal consisting of such fish over the course of a year).  For sensitive subpopulations (e.g. infants, children, pregnant women, and nursing mothers), NJDEP issued "Do Not Eat" advisories for certain species (i.e., no meals at all).

61.    Investigation of AFFF-related contamination in biota in New Jersey is ongoing.

### FACTUAL ALLEGATIONS

62.    AFFF is a fire suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

63.    AFFF contains PFAS, which are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced

18

by fluorine atoms.  The PFAS family includes PFOS and PFOA.

64.  3M's AFFF products, created using an electrochemical fluorination process, contain PFOS and PFOA.  The remaining Defendants' AFFF products, created using a telomerization process, contain or break down into PFOA.  Upon information and belief, AFFF manufactured by Defendants other than 3M is a fungible product and lacks traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Defendant.  Due to this fungibility, it may not be possible to identify the original manufacturer of the AFFF released at any particular site.  Any inability of the Plaintiffs to identify the original manufacturer of the specific AFFF products released into the State's natural resources in particular instances at particular sites is a result of the fungibility of the products, and not as a result of any action or inaction by the Plaintiffs.

65.  When used as intended during a firefighting event or training exercise, AFFF can cause hundreds, if not thousands, of gallons of foamy water laced with PFOS and/or PFOA to enter the environment in a variety of ways, including, but not limited to, through surface water and groundwater.

66.  Defendants advertised, offered for sale, and sold AFFF to the military as well as State government entities, counties, municipalities, local fire departments, and/or other governmental entities and quasi-governmental entities for use in New Jersey.

19

**PFOS and/or PFOA Released from Defendants' AFFF Products
Harm New Jersey's Environment and Wildlife**

67.    PFOS and PFOA have characteristics that have resulted in their extensive and persistent contamination of New Jersey's natural resources.

68.    PFOS and PFOA are Mobile.    Once introduced into the environment, PFOS and PFOA quickly spread because they easily dissolve in water and, thus, reach numerous water systems within the State.

69.    PFOS and PFOA are Persistent.    PFOS and PFOA persist in the environment indefinitely because their multiple fluorine-carbon bonds, which are exceptionally strong and stable, are resistant to metabolic and environmental degradation processes.

70.    PFOS and PFOA Bioaccumulate and Biomagnify.    Because PFOS and PFOA are very slowly excreted from individual organisms, ongoing low level exposure results in a build-up in body burden (i.e., levels of PFOS and PFOA remaining within the body).    They also biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain.

71.    PFOS and PFOA are toxic.    They cause adverse impacts to the environment and animal and human health.

**PFOS and/or PFOA Released from Defendants' AFFF Products
Harm New Jersey's Residents**

72.    PFOS and PFOA are associated with a variety of adverse health effects in humans.

20

73.  PFOS exposure is associated with increases in serum lipids (i.e., high cholesterol), decreases in antibody response to vaccines, increases in risk of childhood infections, and adverse reproductive and developmental effects, including pregnancy-induced hypertension and preeclampsia.

74.  PFOA exposure is associated with increases in serum lipids and certain liver enzymes (indicating liver damage), decreases in antibody response to vaccines, pregnancy-induced hypertension and preeclampsia, decreased birthweight, and testicular and kidney cancer.

75.  Fetuses and newborns are particularly sensitive to PFOS's and PFOA's toxicity.  Further, exposures to newborns are higher (compared to other subpopulations) through breastmilk or prepared formula when drinking water is contaminated with PFOS and/or PFOA.

### Defendants' History of Manufacturing and Selling AFFF

76.  3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s.  In the 1960s, 3M used its fluorination process to develop AFFF.

77.  3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.  National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.  Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.

21

Buckeye began to manufacture, market, and sell AFFF in the 2000s. DuPont and Chemours also manufacture, market, and sell AFFF.

78. From the 1960s through 2001, the United States Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

79. In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environmental management." 3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk." In communications with EPA at that time, 3M also stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention . . . ."

80. After 3M exited the AFFF market, the remaining Defendants continued to manufacture and sell AFFF that contained PFOA and/or its precursors. More recently, Defendants still in the AFFF market have moved to short-chain PFAS-based products.

81. Defendants knew their customers warehoused large stockpiles of AFFF. In fact, Defendants marketed their AFFF products by touting its shelf-life. Even after Defendants fully understood the toxicity of PFOS and PFOA—and their deleterious impacts when released directly into the environment through use

22

and disposal of AFFF exactly as they had marketed it and intended that it be used—Defendants concealed the true nature of PFOS and PFOA.  While Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFOS, PFOA, and/or their precursors.  Defendants further did not act to get their harmful products off the market.  Defendants did not warn public entities or others that, if they used AFFF with PFOS, PFOA, and/or their precursors, they would harm the environment, endanger human health, or incur substantial costs to investigate and clean up contamination of groundwater and other natural resources and to dispose of AFFF.

82.  Accordingly, for many years after the original sale of AFFF that contained PFOS, PFOA, and/or their precursors, these AFFF products were still being applied directly to the ground and washed into sediments, soils and waters, harming the environment and endangering human health.  Defendants never instructed their customers that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

**DEFENDANTS KNEW, OR AT THE VERY LEAST SHOULD HAVE KNOWN, THAT THEIR AFFF PRODUCTS CONTAINING PFOS, PFOA, AND/OR THEIR PRECURSORS WERE HARMFUL TO THE ENVIRONMENT AND HUMAN HEALTH**

A. **3M knew for decades that the PFOS and PFOA in its AFFF products were toxic and sought to suppress negative information regarding these chemicals.**

83.  3M has known for decades that the PFAS, including PFOS

23

and PFOA, contained in its AFFF products are toxic and negatively impact the environment and human health.

84.  By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

85.  3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment.  An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

86.  As early as 1963, 3M knew that its PFAS products were stable in the environment and did not degrade after disposal.

87.  By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

88.  By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life.  One study of 3M's fluorochemicals around this time had to be abandoned to avoid severe pollution of nearby surface waters.

89.  In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFOA-a possibility that 3M considered internally but did not share outside the company.  This finding also alerted 3M to

24

the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in human blood.

90.  As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

91.  In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats.  All monkeys died within the first few days or weeks after being given food contaminated with PFOS.  The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

92.  In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.  A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

93.  According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.  At the time of the specialist's resignation in 1999, 3M continued its resistance.

94.  In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence,

25

accumulation potential, and ecotoxicity of fluorochemicals in the environment."

95.  Also in 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M's employees.

96.  Despite its understanding of the hazards associated with the PFOS and PFOA in its products, 3M actively sought to suppress scientific research on the hazards associated with them, and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health, and the ecological risks of PFOS and PFOA.

97.  At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

98.  3M engaged in a variety of tactics to deceive others and to hide the negative effects of PFAS. For example, Dr. Rich Purdy, a former Environmental Specialist with 3M, wrote a letter detailing:  (1) 3M's tactics to prevent research into the adverse effects of its PFOS; (2) 3M's submission of misinformation about its PFOS to the EPA; (3) 3M's failure to disclose substantial risks associated with its PFOS to the EPA; (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and

26

(6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

99. Despite all of its knowledge, when 3M announced it would phase outs its PFOS, PFOA, and related products (including AFFF), it falsely asserted "our products are safe," instead of fully disclosing the substantial threat posed by PFOS and PFOA.

100. 3M knew, or at the very least should have known, that its AFFF products, in their intended use, would release PFOS and/or PFOA in such a way that would significantly threaten the environment and public health. Such knowledge was accessible to 3M, but not to Plaintiffs until 3M's acts and omissions came to light and the State developed its own understanding of the toxicity of PFOS and PFOA.

**B. Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, National Foam/Angus Fire, DuPont, and Chemours knew, or at the very least should have known, that PFOS and/or PFOA released from their AFFF products was dangerous to the environment and human health.**

101. Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, National Foam/Angus Fire, DuPont, and Chemours knew, or at the very least should have known, that in their intended and/or common use, their AFFF products containing or breaking down into PFOS and/or PFOA would harm the environment and human health.

102. Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, National Foam/Angus Fire, DuPont, and Chemours knew, or at the

27

very least should have known that, their AFFF products released PFOS and PFOA that would dissolve in water, reach water system across the State, resist degradation, bioaccumulate and biomagnify, and harm animal and human health due to their toxicity.

103. Information regarding PFOS and PFOA was readily accessible to each of the above-referenced Defendants for decades, and particularly DuPont, because each is an expert in the field of AFFF manufacture and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products. The State, by contrast, did not have access to such information.

**i.  DuPont knew for decades that the PFOA released from its AFFF products is harmful to the environment and human health, but concealed its knowledge from AFFF users and regulators.**

104. DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

105. In 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This

monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine. As noted above, PFAS, including PFOS and PFOA, contain carbon and fluorine, and human exposure to these chemicals has been linked to elevated organic fluorine levels.

106. By 1979, DuPont had data indicating that workers exposed to PFOA had a significantly higher incidence of health issues than unexposed workers. DuPont did not report these data or the results of its worker health analyses to any government agency or community at that time.

107. The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

108. Not only did DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two-or twenty-five percent-had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

109. DuPont reported to EPA, in March 1982, the results from a rat study showing PFOA crossing the placenta when present in maternal blood, but DuPont concealed the results of the study of its own plant workers.

110. While DuPont knew about PFOA's toxicity danger as early as the 1960s, DuPont was also aware that PFAS was capable of contaminating the surrounding environment and causing human exposure. No later than 1984, DuPont was aware that PFOA is biopersistent.

111. DuPont held a meeting in 1984 to discuss the health and environmental issues related to PFOA. DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

112. DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

113. Despite all of its knowledge regarding PFOA's toxicity, DuPont continued to claim that PFOA posed no health risks. For example, in 2008, DuPont literature is quoted in an article on AFFF appearing in Industrial Fire World magazine, stating that DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

ii.  **DuPont shared knowledge and information regarding PFOA's dangers with other Defendants who were members of the Firefighting Foam Coalition.**

114. The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. All of the Defendants, with the exception of 3M, were members of the FFFC ("FFFC Defendants"). Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

115. The FFFC Defendants worked together to protect AFFF from scrutiny. Their close cooperation, including messaging on PFOA's toxicological profile, indicates DuPont shared knowledge and information of PFOA's dangers with other members. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning the truth about the harms of PFOA to the environment and human health.

31

116. FFFC Defendants regularly published newsletters bolstering their AFFF products. FFFC Defendants also regularly attended conferences. These coordinated efforts were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF products and the PFOA and its precursors contained therein from the government and public. Upon information and belief, they either had an express or tacit understanding to conceal such risks.

117. FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

118. FFFC Defendants knew, however, that their messaging regarding their AFFF products was false. Each of the FFFC Defendants knew that PFOA was released from the use of their AFFF products, and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While this was known to FFFC Defendants, it was not fully understood by the public and regulators, including Plaintiffs.

**AFFF HAS RESULTED IN PFOS AND PFOA CONTAMINATION IN NEW JERSEY, AND AS FURTHER INVESTIGATION CONTINUES, WIDESPREAD CONTAMINATION AND INJURIES TO NATURAL RESOURCES WILL BE UNCOVERED**

119. New Jersey's natural resources have been contaminated with PFOS and PFOA through the transport, storage, use, handling,

32

release, spilling, and/or disposal of AFFF. Investigation of PFOS and PFOA contamination related to AFFF has only recently begun in New Jersey. Defendants' design, manufacturing, marketing, and sales of AFFF throughout the United States, including in New Jersey, have been a substantial factor in causing injuries to the natural resources of New Jersey due to PFOS and PFOA contamination. Major sites of contamination have already been identified. As investigation continues, additional sites are identified, and on- and off-site AFFF-related contamination is delineated, it is expected that widespread contamination from use, handling, and storage of AFFF products will be uncovered.

120. JB MDL is among those sites already identified. JB MDL spans 42,000 acres and houses the combined operations of McGuire Air Force Base, Fort Dix, and Naval Engineering Station Lakehurst. Decades of AFFF use at locations on JB MDL has demonstrably contaminated natural resources on and around the joint base, including groundwater, surface water, sediment, and biota. The results of NJDEP's 2018 Waterways Study has provided an initial understanding of the off-site injuries caused by AFFF-related activities on the joint base.

121. With respect to on-site contamination, sampling in 2016 of 21 areas across the joint base revealed significant contamination of groundwater and surface water, with groundwater monitoring wells showing combined levels of PFOS and PFOA as high

33

as 264,300 ppt, and surface water showing combined levels as high as 8,830 ppt.

122. Off-site, the Department of Defense has done limited sampling of drinking water supplies, which revealed that there were three private drinking water wells near the base with combined levels of PFOS and PFOA over 70 ppt, ranging from 152 ppt to 1,688 ppt.

123. NJDEP's 2018 Waterways Study revealed significant damage to Little Pine Lake, Mirror Lake, and Pine Lake as a result of AFFF use on the joint base. Little Pine Lake receives drainage from the western edge of JB MDL; Mirror Lake receives drainage from the central area of JB MDL; Pine Lake receives drainage from the northern portion of JB MDL.

124. <u>Little Pine Lake</u>. Surface water from Little Pine Lake had the highest concentration of total PFAS of any surface water sampled as part of the 2018 PFAS waterways study, with a total concentration of 279.5 ppt. The largest component of this total PFAS concentration was PFOS at 100 ppt; the sample also included PFOA at 25.09 ppt. Sediment from Little Pine Lake also had the highest concentration of total PFAS in sediment in the study, at 30.93 nanograms/gram ("ng/g"). The largest component of this PFAS concentration in sediment was also PFOS, at 28.10 ng/g. Fish in Little Pine Lake also had elevated levels of PFOS, including yellow perch (average 118.60 ng/g), largemouth bass (average 73.67 ng/g),

34

and pumpkinseed (average 31.80 ng/g). PFOS in yellow perch and largemouth bass was so severe that NJDEP issued advisories for these species recommending limiting consumption to once per year. NJDEP issued a consumption advisory for pumpkinseed of once per every three months. For sensitive subpopulations, NJDEP issued "Do Not Eat" advisories for the above-referenced species.

125. <u>Mirror Lake</u>. Surface water at Mirror Lake had the second highest concentration of total PFAS in the waterways study, with a total PFAS concentration of 180.9 ppt, which included PFOS of 72.9 ppt and PFOA of 13.2 ppt. Sediment from Mirror Lake had a total concentration of PFAS of 3.55 ng/g, mostly consisting of PFOS (which was 3.07 ng/g). Fish in Mirror Lake had elevated levels of PFOS, including the American eel (average of 33.73 ng/g), largemouth bass (average of 39.63 ng/g), and bluegill sunfish (average of 22.20 ng/g). NJDEP issued consumption advisories for the above-referenced species of once per three months, and "Do Not Eat" advisories for sensitive subpopulations.

126. <u>Pine Lake</u>. Surface water at Pine Lake had the third highest concentration of total PFAS in the waterways study, with a total PFAS concentration of 170.7 ppt. However, Pine Lake had the highest concentration of any single PFAS in surface water, which was PFOS at 102 ppt. PFOA in surface water was 13.6 ppt. Similarly, Pine Lake had the highest concentration of PFOS in sediment, at 19.30 ng/g. Fish in Pine Lake had elevated levels of

35

PFOS, including the American eel (average 162.5 ng/g), largemouth bass (114 ng/g), and pumpkinseed (119.2 ng/g). NJDEP issued once per year consumption advisories for the above-referenced species, and "Do Not Eat" advisories for sensitive subpopulations.

127. The FAA Technical Center is another site with significant AFFF-related contamination. The FAA Technical Center includes research facilities and a joint-civil military airport, and is located 10 miles northwest of Atlantic City. Additionally, the ACMUA's drinking water supplies, consisting of surface water reservoirs and public supply wells, is located on the property. Among other things, AFFF was used at the FAA Technical Center for various training exercises for airport firefighting personnel. As part of a 2009-2010 occurrence study of PFAS in raw water from public water systems, NJDEP collected samples from Doughty Pond (a/k/a Lower Reservoir) and Kuehnle Pond (a/k/a Upper Reservoir). Sampling showed various PFAS in the reservoirs, with high concentrations of total PFAS and elevated levels of PFOS (25 ppt in Doughty Pond, and 43 ppt in Kuehnle Pond) and PFOA (32 ppt in Doughty Pond, and 33 ppt in Kuehnle Pond).

128. In 2014 and 2016, sampling of groundwater from a former fire training area at the FAA Technical Center, known as Area 29, revealed concentrations of PFOS and PFOA as high as 95,000 ppt and 41,000 ppt, respectively. Investigation of PFOS and PFOA

36

contamination at the site, including its effect on surface water and groundwater serving as drinking water supplies, is ongoing.

129. There are also two Navy bases where use of AFFF has contaminated the site and is impacting surrounding private wells. At Naval Weapons Station Earle, nine on-base groundwater monitoring wells revealed combined levels of PFOS and PFOA above 70 ppt, ranging from 75 ppt to 2,900 ppt. At least two off-site nearby private wells also had combined levels above 70 ppt, and others have elevated levels of PFOS and/or PFOA. At the former Naval Air Warfare Center in Trenton, 23 of 38 on-base groundwater monitoring wells revealed combined levels of PFOS and PFOA above 70 ppt, ranging from 178 ppt to 27,800 ppt. At least one off-site groundwater monitoring well sampled revealed a combined PFOS and PFOA level of 112 ppt. Limited sampling at the Navy bases, as well as the use of higher criteria for sampling by the Department of Defense, only provides a limited understanding of the extent of contamination around these sites.

130. As investigation of AFFF-related contamination continues, additional military and industrial facilities, airports, and fire training academies will be uncovered as contamination sites, impacting not only the immediate area, but surrounding areas, as well. Such investigation is necessary to ascertain the scope of AFFF-related contamination and to return the natural resources impacted to levels that are safe for human

37

health and the environment as well as to the condition they were in prior to the impact of these contaminants. Defendants are liable for the cost of such investigation and restoration.

## FIRST COUNT
### Strict Products Liability—Design Defect

131. Plaintiffs repeat each allegation of Paragraphs 1 through 130 above as though fully set forth in its entirety herein.

132. Defendants designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey during the relevant period.

133. As designers, manufacturers, marketers, and sellers of AFFF, Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses. Defendants owed that duty both to reasonably foreseeable users of their products and also to any person or property that might reasonably be expected to come into contact with those products.

134. Defendants' AFFF products containing PFOS, PFOA, and/or their precursors were used in a reasonably foreseeable manner and without substantial change in the condition of such products. These products were defective and unfit for their reasonable use. Defendants' AFFF products foreseeably contaminated groundwater, surface water, sediments, soils, biota, and other natural

resources at and around the sites where they were used. Defendants knew or reasonably should have known that their manufacture, marketing, and/or sale, as well as their customers' transport, storage, use, handling, release, spilling and/or disposal of AFFF in an intended or reasonably foreseeable manner, would result in the release of PFOS and PFOA in the environment, including at various locations in New Jersey.

135. AFFF products containing PFOS, PFOA, and/or their precursors used at various sites in New Jersey have injured and are continuing to injure groundwater, surface water, sediments, soils, biota, and other natural resources at and/or around these sites. Defendants' AFFF products were defective in design and unreasonably dangerous because, among other things:

1) Defendants' AFFF products cause extensive and persistent PFOS and PFOA contamination when used in a reasonably foreseeable and intended manner;

2) PFOS and PFOA released into the environment from Defendants' AFFF products cause contamination in groundwater and surface water that are the sources of drinking water and pose significant threats to public health and welfare; and

3) Defendants failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the

39

environmental   fate   and   transport   and   potential ecological and human health effects of PFOS and PFOA.

136. At all times relevant to this action, the AFFF products that Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

137. At all times relevant to this action, the foreseeable risk to the environment and public health and welfare posed by Defendants' AFFF products containing PFOS, PFOA, and/or their precursors outweighed the cost to Defendants of reducing or eliminating such risk.

138. At all times relevant to this action, Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF products, and the omission of such alternative designs rendered their AFFF products not reasonably safe. While Defendants have recently transitioned to short-chain PFAS-based AFFF products, which they claim are safer, they could have made this transition earlier. Moreover, AFFF can be designed with fluorine-free compounds, which do not contain or break down into PFAS.

139. As a direct and proximate result of the defects in Defendants' design, manufacture, marketing, and sale of AFFF products containing PFOS, PFOA, and/or their precursors, groundwater, surface water, sediments, soils, biota and other

40

natural resources at and/or near the various sites throughout New Jersey where the AFFF was used have become contaminated with PFOS and/or PFOA, causing the State and its citizens significant injury and damage.

140. As a direct and proximate result of Defendants' acts and omissions, as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages in an amount to be proved at trial related to PFOS and PFOA contamination of groundwater, surface water, sediment, soils, biota, and other natural resources at and/or near the various sites throughout New Jersey where Defendants' AFFF products were transported, stored, used, handled, released, spilled, and/or disposed.

141. As a further direct and proximate result of Defendants' acts and omissions alleged in this Complaint, Plaintiffs have incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface waters, sediments, soils, biota, and other natural resources at and/or near the various sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed, for which Defendants are strictly, jointly, and severally liable.

142. Defendants knew it was substantially certain that their acts and omissions described above would cause the contamination and harms described herein.

143. This suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

144. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

145. Defendants are strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE,** NJDEP requests that this Court enter judgment against Defendants as follows:

a.  Finding Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey

42

for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1)    Past and future testing of natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed, and thus likely caused PFOS and/or PFOA contamination;

2)    Past and future treatment of all natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

3)    Past and future monitoring of the State's natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

43

b.  Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Defendants' AFFF;

c.  Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Defendants' AFFF;

d.  Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Defendants' AFFF of such natural resources;

e.  Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

f.  Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused at and around sites within the State;

44

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

h.   Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## SECOND COUNT
### Strict Products Liability—Failure to Warn

146. Plaintiffs repeat each allegation of Paragraphs 1 through 145 above as though fully set forth in its entirety herein.

147. As designers, manufacturers, marketers, and sellers of AFFF products containing PFOS, PFOA, and/or their precursors, Defendants had a strict duty to the State and to those who were at risk of being harmed by AFFF to warn users of those products and the State of the foreseeable harms associated with them.

148. Defendants had a duty to warn the State about the dangers of their AFFF products because, among other things, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; because NJDEP is charged with enforcing the State's environmental laws and regulations; and because the State maintains a "quasi-sovereign" interest in the well-being of its residents.

149. Defendants inadequately warned of the likelihood that PFOS and/or PFOA would be released into the environment during the normal use of Defendants' AFFF products, and of the widespread, toxic, and persistent effects of such releases. Defendants failed to provide such warnings to (i) users and buyers of their AFFF products containing PFOS, PFOA, and/or their precursors, (ii) the State, and (iii) others to which it was reasonably foreseeable Defendants' AFFF products would cause harm. To the extent Defendants provided any warnings about their products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by AFFF containing PFOS, PFOA, and/or their precursors, and the warnings did not convey adequate information on the dangers of AFFF containing these chemicals to the mind of a reasonably foreseeable or ordinary user or bystander.

150. Despite the fact that Defendants knew or should have known about the risks of AFFF containing PFOS, PFOA, and/or their precursors, Defendants withheld such knowledge from Plaintiffs, regulators, and the public. Moreover, Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers they pose.

151. At no time relevant to this action did Defendants warn users and buyers of their AFFF products, the State, and others who

46

it was reasonably foreseeable would be harmed by AFFF, that Defendants' AFFF products would release PFOS and/or PFOA into the environment during the products' normal use, and of the widespread, toxic, and persistent effects of such releases.

152. Defendants' AFFF products were in the same condition when they were purchased and/or used as they were when they left Defendants' control. Defendants' customers used the AFFF products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

153. Had Defendants provided adequate warnings about the hazards associated with their AFFF products containing PFOA, PFOS, and/or their precursors, users and buyers, the State, and others who it was reasonably foreseeable would be harmed by the AFFF products would have heeded those warnings.

154. As a direct and proximate result of Defendants' failure to warn of the hazards of AFFF containing PFOS, PFOA, and/or their precursors, groundwater, surface water, sediments, soils, biota, and other natural resources at and around various sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed have become contaminated with PFOS and PFOA.

155. As a direct and proximate result of Defendants' acts and omissions, NJDEP has incurred, is incurring, and will continue to

47

incur in the future damages related to PFOS and PFOA contamination in an amount to be proved at trial.

156. Defendants knew it was substantially certain that their acts and omissions described above would cause the State's injury and damage.

157. This suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

158. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

159. Defendants are strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

    a.   Finding Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout New Jersey where Defendants' AFFF products were transported, stored, used, handled, released, spilled, and/or disposed so the contaminated

natural resources. are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed, and thus likely caused PFOS and/or PFOA contamination;

2) Past and future treatment of all natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence

of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

b.  Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Defendants' AFFF;

c.  Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Defendants' AFFF;

d.  Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Defendants' AFFF of such natural resources;

e.  Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

f.    Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused at and around sites within the State;

g.    Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

h.    Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.    Awarding Plaintiffs such other relief as this Court deems appropriate.

### THIRD Count
### Negligence

160. Plaintiffs repeat each allegation of Paragraphs 1 through 159 above as though fully set forth in its entirety herein.

161. Defendants had a duty to the State to ensure that PFOS and/or PFOA were not released as a result of the transport, storage, use, handling, release, spilling and/or disposal of their AFFF products, and did not injure groundwater, surface water, sediment, soils, and biota in New Jersey.

162. Defendants had a duty to the State to exercise due care in the design, manufacture, marketing, sale, testing, labeling, and instructions for use of their AFFF products containing PFOS, PFOA and/or their precursors.

163. Defendants breached these duties.

164. As a direct and proximate result of Defendants' negligence in designing AFFF and in failing to warn AFFF purchasers, the State, and others who it was reasonably foreseeable would be harmed by the dangers of Defendants' AFFF products, groundwater, surface water, sediments, soils, biota, and other natural resources at and around various sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed have become contaminated with PFOS and PFOA.

165. As a further direct and proximate result of the contamination of the environment from Defendant's AFFF containing PFOA, PFOS, and/or their precursors, NJDEP has incurred, is incurring, and will continue to incur investigation, clean up and removal, treatment, monitoring and restoration costs, and expenses for which Defendants are jointly and severally liable.

166. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## PRAYER FOR RELIEF

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

a.  Finding Defendants liable for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1)  Past and future testing of natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, released, spilled, and/or disposed, and thus likely caused PFOS and/or PFOA contamination;

2)  Past and future treatment of all natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

53

3)   Past and future monitoring of the State's natural resources at and around the sites throughout New Jersey where Defendants' AFFF was transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

b.   Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Defendants' AFFF;

c.   Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Defendants' AFFF;

d.   Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Defendants' AFFF of such natural resources;

e.   Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, _parens_

patriae, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f.   Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused at and around sites within the State;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

### FOURTH COUNT
### Public Nuisance

167. Plaintiffs repeat each allegation of Paragraphs 1 through 166 above as if fully set forth in their entirety herein.

168. Groundwater, surface water, sediments, soils, and biota are natural resources of the State held in trust by the State.

169. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

170. The contamination of the groundwater, surface water, sediment, soils, and biota at and around the various sites

throughout New Jersey where Defendants' AFFF products were transported, stored, used, handled, released, spilled, and/or disposed constitutes a physical invasion of the State's natural resources, and upon information and belief, the State's real property in the vicinity of these sites, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the NJDEP, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

171. As long as these natural resources at and around these various sites throughout New Jersey contaminated by Defendants' AFFF products remain contaminated due to Defendants' conduct, the public nuisance continues.

172. Until these natural resources are restored to their pre-injury quality, Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

173. Defendants marketed AFFF to their customers, including New Jersey governmental entities, knowing that the use of their AFFF—used exactly as marketed for intended use—would create a public nuisance. Likewise, well after the Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFOS and PFOA in the environment, Defendants never instructed their customers, including New Jersey governmental entities, to stop applying the AFFF in their possession or that they needed to specially dispose of AFFF so as to not further contaminate the natural resources of the State.

174. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## PRAYER FOR RELIEF

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

a.  Ordering Defendants to reimburse NJDEP for its costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources at and around the sites throughout New Jersey where Defendants' AFFF products were transported, stored, used, handled, released,

57

spilled, and/or disposed so that such natural resources are restored to their original condition;

b.   Compelling Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of the State's natural resources at and around the sites throughout New Jersey where Defendants' AFFF products were transported, stored, used, handled, released, spilled, and/or disposed so that such natural resources are restored to their original condition;

c.   Compelling Defendants to pay special damages to NJDEP, funding its performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the transport, storage, use, handling, release, spilling, and/or disposal of Defendant's AFFF products, and compelling Defendants to compensate the citizens of New Jersey, for the costs of restoration and replacement, including lost use and value of any injured natural resource;

d.   Awarding Plaintiffs punitive damages in an amount to be determined by the tier of fact;

e.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this

action, together with prejudgment interest, to the full extent permitted by law; and

f.    Awarding Plaintiffs such other relief as this Court deems proper.

## FIFTH COUNT
### Consumer Fraud Act

175. Plaintiffs repeat each allegation of Paragraphs 1 through 174 above as though fully set forth in its entirety herein.

176. The CFA prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . .

177. The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

178. The AFFF advertised, offered for sale, and sold by Defendants comprise merchandise within the meaning of the CFA.

179. Defendants advertised, offered for sale, and sold AFFF to New Jersey State government entities, counties, municipalities, local fire departments, and/or other New Jersey governmental entities.

180. New Jersey State government entities, counties, municipalities, and local fire departments are consumers entitled to protection under the CFA.

181. Defendants, in the course of advertising, offering for sale, and selling AFFF, have engaged in unconscionable commercial practices, deception, misrepresentations, and/or knowing omissions of material fact in violation of the CFA.

182. Defendants have engaged in unconscionable commercial practices and deception, including, but not limited to, the following:

a.  Selling AFFF to New Jersey State government entities, counties, municipalities, local fire departments, and/or other New Jersey governmental entities, despite knowing that use of the AFFF would result in PFOS and/or PFOA contamination, and thus burdening these entities with costs of investigation, clean up, and disposal of existing stockpiles.

b.  Despite knowing the dangers associated with PFOS and PFOA, withholding this knowledge from New Jersey State government entities, counties, municipalities, local fire departments, and other New Jersey governmental entities, such that these entities did not understand the full consequences of their use of AFFF.

60

    c.    Deceptively claiming that their AFFF products were safe and/or did not present a threat to the environment or human health.

183. Defendants have made misrepresentations, including, but not limited to, representing that AFFF was safe and did not pose a threat to the environment or human health, when such was not the case.

184. Defendants have engaged in the knowing omissions or concealments of material facts, including, but not limited to the following:

    a.    Omitting or concealing material facts regarding the mobile, persistent, bioaccumulative, and toxic nature of PFOS and PFOA;

    b.    Omitting or concealing material facts regarding the effect of using Defendants' AFFF products on the environment and human health.

185. Each unconscionable commercial practice, act of deception, misrepresentation, and/or knowing omission of fact by Defendants constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

## PRAYER FOR RELIEF

**WHEREFORE**, the Attorney General and the Director request that this Court enter judgment against Defendants as follows:

a.  Finding that the acts, practices and omissions of
    Defendants constitute multiple violations of the CFA,
    N.J.S.A. 56:8-1 to -210;

b.  Permanently enjoining Defendants and their owners,
    officers, directors, shareholders, founders, managers,
    agents, servants, employees, representatives,
    independent contractors, corporations, subsidiaries,
    affiliates, successors, assigns, and all other persons
    or entities directly under their control, from engaging
    in, continuing to engage in, or doing any of the acts or
    practices in violation of the CFA, N.J.S.A. 56:8-1 to -
    210, including, but not limited to, the acts and
    practices alleged in this Complaint, as authorized by
    the CFA, specifically N.J.S.A. 56:8-8;

c.  Directing Defendants to disgorge all funds and property
    (real and personal) acquired and/or retained as a result
    of any acts or practices in violation in violation of
    the CFA, as authorized by N.J.S.A. 56:8-8;

d.  Directing Defendants to restore to any affected New
    Jersey State government entities, counties,
    municipalities, local fire departments, and other New
    Jersey governmental entities, any money or real or
    personal property acquired by means of any practice

62

alleged herein to be unlawful and found to be unlawful, as authorized by N.J.S.A. 56:8-8;

e.   Directing Defendants to pay the maximum statutory civil penalties, for each and every violation of the CFA, pursuant to N.J.S.A. 56:8-13;

f.   Directing Defendants to pay costs and fees, including attorneys' fees, for use of the State, pursuant to N.J.S.A. 56:8-11 and -19; and

g.   Granting Plaintiffs such other relief as the interests of justice may require.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

## RULE 4:5-1 CERTIFICATION

I hereby certify that, to the best of my knowledge and belief, the matter in controversy is not the subject of any action pending in any other court or of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

I know of no other parties other than the parties set forth in this pleading who should be joined in the above action.   I recognize the continuing obligation of each party to file with the Court and serve on all parties an amended Certification if there is a change in the facts stated in the original Certification.

63

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Plaintiffs designate Leonard Z. Kaufmann, Esq., as trial counsel in this matter.


Dated:  May 14, 2019

**Gurbir S. Grewal**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorneys for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
  (Atty. ID #000081999)
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 376-2761

**COHN LIFLAND PEARLMAN**
**HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

By: */s/ Leonard Z. Kaufmann*
Leonard Z. Kaufmann
  (Atty. ID #045731994)
A Member of the Firm
Also by:  Joseph A. Maurice
          Christina N. Stripp
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By:     William J. Jackson
        John Gilmour
        David Reap
        Melissa E. Byroade
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General
By:     John K. Dema

64

Scott E. *Kauff*
John T. Dema
James Crooks
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Tel.: (340) 773-6142

65

# Civil Case Information Statement

## Case Details: MERCER | Civil Part Docket# L-000953-19

**Case Caption:** GREWAL GURBIR VS THE 3M COMPANY

**Case Initiation Date:** 05/14/2019

**Attorney Name:** LEONARD ZEE KAUFMANN

**Firm Name:** COHN LIFLAND PEARLMAN HERRMANN & KNOPF

**Address:** PARK 80 WEST - PLAZA ONE 250 PEHLE AVE STE 401

SADDLE BROOK NJ 07663

**Phone:**

**Name of Party:** PLAINTIFF : GREWAL, GURBIR, S

**Name of Defendant's Primary Insurance Company (if known):** Unknown

**Case Type:** ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Other(explain)  Regulator

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO          **Title 59?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

05/14/2019
Dated

/s/ LEONARD ZEE KAUFMANN
Signed

MERCER COUNTY COURTHOUSE
CIVIL CASE MANAGMENT OFFICE
175 SOUTH BROAD ST P O BOX 8068
TRENTON       NJ 08650-0068

                              TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (609) 571-4200
COURT HOURS  8:30 AM - 4:30 PM


                    DATE:   MAY 14, 2019
                    RE:     GREWAL GURBIR  VS 3M COMPANY
                    DOCKET: MER L -000953 19


     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

     DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE MANAGING JUDGE ASSIGNED IS:  HON DOUGLAS H. HURD

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     050
AT:  (609) 571-4200.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.

                    ATTENTION:

                         ATT: LEONARD Z. KAUFMANN
                         COHN LIFLAND PEARLMAN HERRMANN
                         PARK 80 WEST - PLAZA ONE
                         250 PEHLE AVE STE 401
                         SADDLE BROOK      NJ 07663


JUWWIL3