IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| GURBIR S. GREWAL, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and PAUL R. RODRÍGUEZ, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, | ) ) ) ) ) ) ) ) | MDL No. 2873<br><br>Master Docket No. 2:18-mn-2873<br><br>Judge Richard Mark Gergel<br><br>Civil Action No. 2:19-cv-02199-RMG |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND |
| THE 3M COMPANY; TYCO FIRE PRODUCTS LP; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; ARKEMA, INC.; AGC CHEMICALS AMERICAS, INC.; DYNAX CORPORATION; CLARIANT CORPORATION; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; and "ABC CORPORATIONS" 1-10 (Names Fictitious), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, Gurbir S. Grewal, Attorney General of New Jersey (the "Attorney General"), the

New Jersey Department of Environmental Protection ("NJDEP"), and Paul R. Rodríguez, Acting

Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs")

file this First Amended Complaint pursuant to Case Management Order No. 3D and E, *In re:*

*Aqueous Film-Forming Foams Products Liability Litigation*, 2:18-mn-02873-RMG (D.S.C.)

against Defendants THE 3M COMPANY; TYCO FIRE PRODUCTS LP; CHEMGUARD, INC.;

BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM,

INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; ARKEMA, INC.; AGC CHEMICALS AMERICAS, INC.; DYNAX CORPORATION; CLARIANT CORPORATION (collectively, "Manufacturer Defendants"); DUPONT DE NEMOURS, INC.; and CORTEVA, INC. (collectively with Manufacturer Defendants, "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1.      NJDEP brings this civil action against Manufacturer Defendants pursuant to the common law of New Jersey for injuries to natural resources of the State of New Jersey ("New Jersey" or "State"), including groundwater, surface water, sediments, soils, and biota, as a result of releases of perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") into the environment due to the use, handling, and storage of aqueous film-forming foam ("AFFF"). PFOS and PFOA are two persistent, bioaccumulative, and toxic substances within the class of man-made chemicals known as per- and polyfluoroalkyl substances ("PFAS"). Manufacturer Defendants in this case include manufacturers of AFFF, as well as the manufacturers of PFAS-containing fluorochemicals and/or fluorosurfactants used to make AFFF (collectively, "AFFF Products"). Manufacturer Defendants' AFFF Products were used at various locations throughout New Jersey, causing widespread contamination of the State's natural resources with PFOS and PFOA.

2.      Additionally, the Attorney General and the Director bring this action against Manufacturer Defendants pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -210 (the "CFA"), based on Manufacturer Defendants' deceptive and fraudulent business practices in connection with their advertisement, offer for sale, and sale of AFFF Products to New Jersey State government entities, counties, municipalities, and local fire departments. Affected entities include county fire training academies as well as potentially hundreds of local fire departments

2

that purchased and used these products in their performance of important public services, but were deceived by Manufacturer Defendants about the risks posed by AFFF Products, and have been left to deal with the consequences. The Attorney General and the Director are thus seeking civil penalties based on Manufacturer Defendants' conduct, as well as restitution for these entities.

3.      AFFF is used to fight fuel and other flammable liquid fires. When the AFFF concentrate is mixed with water, a foam solution is formed. The foam is sprayed onto fire to produce an aqueous film, which blocks the fire's supply of oxygen, generates a cooling effect, creates an evaporation barrier, and prevents re-ignition.

4.      Manufacturer Defendants designed, manufactured, marketed, and sold AFFF Products throughout the United States, including in New Jersey. These AFFF Products contained PFOS, PFOA, and/or their precursors (*i.e.*, substances that break down in the environment into PFOS or PFOA). When used, the AFFF Products thus released PFOS and PFOA into the environment. At all times relevant, Manufacturer Defendants together controlled all, or substantially all, of the market in New Jersey for AFFF Products.

5.      PFOS and PFOA present a significant threat to New Jersey's environment and residents. They are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain. PFOS and PFOA are also associated with a laundry list of adverse health effects in humans. PFOS is associated with immune system suppression, including decreases in antibody responses to vaccines and increases in risk of childhood infections. PFOA is associated with, among other things, high cholesterol, increased liver enzymes, pregnancy-induced hypertension, and testicular and kidney cancer.

6.      Confronted with PFOS and PFOA contamination, New Jersey has acted to regulate these contaminants of emerging concern. Among other things, NJDEP has adopted regulations

establishing maximum contaminant levels (which are drinking water standards) and groundwater quality standards (which are health-based standards applicable to groundwater used for drinking water).  For PFOS those standards are 13 parts per trillion ("ppt"), and for PFOA those standards are 14 ppt.

7.      Since the creation of AFFF in the 1960s, Manufacturer Defendants have sold their AFFF Products to military and industrial facilities, airports, firefighting training academies, and local fire departments in New Jersey and elsewhere.  These entities used Manufacturer Defendants' AFFF Products as they were intended to be used and in a foreseeable manner, which introduced PFOS and PFOA into the environment and contaminated New Jersey's natural resources.  As a reference, a single firefighting training event can release thousands of gallons of foam-laced water into the environment.

8.      Manufacturer Defendants were fully aware, for decades, of the toxic nature of PFOS and PFOA and the harmful and negative impact these substances have on the environment, wildlife, and human health.  Nevertheless, they continued to manufacture, market, and sell their AFFF Products in New Jersey and elsewhere, and concealed the threat associated with use of their products.

9.      Investigation of AFFF-related contamination in New Jersey is ongoing.  Presently, sites identified with PFOS and/or PFOA contamination attributable to AFFF Products include several military facilities, such as Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties ("JB MDL"), Naval Weapons Station Earle in Monmouth County, and the Naval Air Warfare Center in Trenton, as well as a research facility and airport, the Federal Aviation Administration William J. Hughes Technical Center in Atlantic County ("FAA Technical

Center").  As investigation continues, it is expected that widespread contamination from use, handling, and storage of AFFF Products will be uncovered in New Jersey.

10.     Accordingly, this action seeks to require Manufacturer Defendants to pay all costs necessary to fully investigate the various locations throughout New Jersey where their AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed, as well as all areas affected by their AFFF Products.

11.     Likewise, this action seeks to require Manufacturer Defendants to pay all costs necessary to investigate, remediate, assess, and restore the sites in New Jersey where their AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed, as well as all of the off-site areas and natural resources that have been contaminated by their AFFF Products.

12.     Further, in addition to the resources needed to remediate AFFF Products-related contamination, the New Jersey governmental entities that purchased these products are now forced to spend additional money to properly dispose of AFFF stockpiles.  These costs are rightfully borne by Manufacturer Defendants, and are thus sought through this action, as well.

13.     Plaintiffs also seek from Manufacturer Defendants all damages that Plaintiffs are entitled to recover, including damages for injuries to all of the State's natural resources, property damages to State and local government-owned properties, economic damages, restitution and disgorgement of Manufacturer Defendants' ill-gotten profits, punitive damages, and all other damages, fees, costs, and equitable relief to which they may be entitled.

14.     In addition, the State asserts claims in its capacity as creditor under the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, based on a web of transactions that Defendant E.I. du Pont de Nemours and Company ("Old DuPont")

orchestrated over the past decade, all designed to shield significant assets from the State and other creditors.

15.    Old DuPont has known for decades that it faces unprecedented environmental and tort liabilities for PFAS that it released into the environment in numerous parts of the country in combination with its massive environmental liabilities unrelated to PFAS.  For years, it has, at every step, sought to hinder the State, and many other states facing massive harm to the well-being of their citizens and their natural resources, from being able to recover on their eventual judgments by attempting to put assets outside the reach of creditors.

16.    Old DuPont has sought to limit its PFAS and environmental liabilities by engaging in a series of complex restructuring transactions, including (i) the "spinoff" of its performance chemicals business (which included the manufacture of products which involved the use of PFOA and other PFAS) into Defendant The Chemours Company ("Chemours"), (ii) a purported merger with The Dow Chemical Company, (iii) the transfer of Old DuPont's historic assets to other entities, including Defendant DuPont de Nemours Inc. ("New DuPont"), and, ultimately, (iv) the spin-off of Old DuPont to a new parent company, Defendant Corteva, Inc. ("Corteva").  These transactions were all designed to shield billions of dollars in assets from the PFAS and environmental liabilities that Old DuPont tried to isolate in Chemours.

17.    Old DuPont also sought to hide critical details of these transactions by burying them in non-public schedules to agreements in an attempt to keep the State and other creditors in the dark.  What is clear, however, is that Old DuPont shed more than $20 billion in tangible assets as a result of its restructuring efforts and attempted to put those assets outside of the State's reach. This is the exact type of scheme that the Uniform Fraudulent Transfer Act is designed to prevent.

**THE PARTIES**

18.    NJDEP is a principal department within the Executive Branch of the State

6

government.  Under the leadership of the Commissioner, it is vested with the authority to conserve

natural resources, protect the environment, prevent pollution, and protect the public health and

safety.  N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

19.     The State is the trustee, for the benefit of its citizens, of all natural resources within

its jurisdiction.  NJDEP is vested with the authority to protect this public trust and to seek

compensation for any injury to the natural resources of this State.  N.J.S.A. 58:10-23.11a.  In

addition, the State may act in its *parens patriae* capacity to protect the State's "quasi-sovereign"

interests, including its interest in the health and well-being of its residents and the integrity of its

natural resources.  NJDEP brings this case in its trustee, *parens patriae*, and regulatory (police

power) capacities.

20.     Plaintiff Attorney General is the chief law enforcement officer and chief legal

officer of the State, and is charged with, among other things, the responsibility of enforcing the

CFA.  Plaintiff Director is charged with the responsibility of administering the CFA on behalf of

the Attorney General.

21.     Defendant The 3M Company ("3M") is a corporation organized and existing under

the laws of the State of Delaware, with its principal place of business located at 3M Center, St.

Paul, Minnesota 55144-1000.  On information and belief, 3M has designed, manufactured,

marketed, and sold AFFF containing PFOS, PFOA, and/or their precursors that was transported,

stored, handled, used, released, spilled, and/or disposed in New Jersey.  Based on a preliminary

survey of local fire departments in New Jersey, at least 80 local fire departments maintain

stockpiles of 3M's AFFF, totaling thousands of gallons of stockpiled AFFF containing PFOS,

PFOA, and/or their precursors.

22.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under

the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.  On information and belief, Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (collectively, "Tyco/Ansul").  On information and belief, Tyco/Ansul has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

23.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.   On information and belief, Chemguard has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.  Chemguard acquired Ciba Specialty Chemical Corporation's ("Ciba") fluorosurfactants business in 2003.  Further, on information and belief, Chemguard has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

24.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.  On information and belief, Buckeye has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

25.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101.  On information and belief, Kidde-Fenwal is the successor-

in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").  On information and belief, Kidde/Kidde Fire has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.  Among other things, in or around 2004 and 2005, Kidde/Kidde Fire sold tens of thousands of gallons of its AFFF to New Jersey State entities, which in turn were distributed to counties and local fire departments for storage and use.

26.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.  On information and belief, National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire").   On information and belief, National Foam/Angus Fire has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

27.     Defendant E.I. du Pont de Nemours and Company ("Old DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  On information and belief, Old DuPont has designed, manufactured, marketed, and sold fluorochemicals and/or fluorosurfactants containing PFOA and/or its precursors  used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

28.     Defendant The Chemours Company ("Chemours") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware 19899.  In 2015, Old DuPont spun off

its performance chemicals business to Chemours, along with vast environmental liabilities. On information and belief, Chemours has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

29.    Defendant Arkema, Inc. ("Arkema") is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. On information and belief, Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. On information and belief, Arkema and/or its predecessors have designed, manufactured, marketed, and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

30.    Defendant AGC Chemicals Americas, Inc. ("AGC Chemicals") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 5 East Uwchlan Avenue, Suite 201 Exton, Pennsylvania 19341. On information and belief, AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). On information and belief, AGC Chemicals and/or its affiliates have designed, manufactured, marketed, and sold fluorochemicals containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

31.    Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. On information and belief, Dynax has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

32.     Defendant Clariant Corporation ("Clariant") is a corporation organized under the laws of the State of New York, with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.  On information and belief, Clariant has designed, manufactured, marketed, and sold fluorochemicals containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, released, spilled, and/or disposed in New Jersey.

33.     Manufacturer Defendants represent all or substantially all of the New Jersey market for AFFF Products.

34.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company ("Old Dow") and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities – including those relating to PFAS.

35.     Defendant Corteva, Inc. ("Corteva") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.  In 2019, New DuPont spun off a new, publicly-traded company, Corteva, which currently holds Old DuPont as a subsidiary.  In connection with these transfers, on information and belief, Corteva assumed certain Old DuPont liabilities – including those relating to PFAS.

36.     Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this First Amended Complaint, certain

of which are manufacturers of AFFF, manufacturers of PFAS-containing fluorochemicals and/or fluorosurfactants used to make AFFF, and/or distributors of AFFF Products.

## AFFECTED NATURAL RESOURCES

37.    The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust or otherwise controlled by the State. N.J.S.A. 58:10-23.11b.

38.    The natural resources of this State include the "waters of the State," which are the ocean and its estuaries, all springs, streams and bodies of surface or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction. N.J.S.A. 58:10A-3(t).

39.    For purposes of this First Amended Complaint, natural resources of this State do not include those natural resources on or underlying federally-owned property, such as military facilities. Likewise, through this First Amended Complaint, NJDEP is not seeking relief at the Chemours and/or Old DuPont facilities at Chambers Works, Parlin, Pompton Lakes or Repauno, which are the subject of separate, site-specific litigation.

40.    New Jersey's habitats and ecosystems—lakes, rivers, forests, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—are some of the most threatened in the nation. They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

41.    PFOS and PFOA attributable to AFFF Products have been found in groundwater, surface water, sediments, soils, biota, and other natural resources around presently identified sites where AFFF Products were transported, stored, used, handled, released, spilled and/or disposed. Further AFFF Products-related contamination to natural resources will be uncovered as investigation continues.

42.    These natural resources have intrinsic (*i.e.*, inherent existence) values. The current

and future residents of New Jersey have a right to a clean environment.

## Groundwater

43.     Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Jersey.  More than half of New Jersey's population obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

44.     Private wells, which provide access to groundwater, are used in residential communities surrounding military and industrial facilities, airports, and firefighting training academies where AFFF Products were transported, stored, used, released, spilled and/or disposed.  Wells are used for drinking water, irrigation, and filling swimming pools, among other things.

45.     Further, not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem.  Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

46.     Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents salt water intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

47.     Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

48.     AFFF Products are a significant source of PFOS and PFOA contamination in groundwater.

49.     Investigations at military facilities in New Jersey have revealed elevated levels of PFOS and PFOA in groundwater at and surrounding those facilities, which include JB MDL, Naval Weapons Station Earle, and the Naval Air Warfare Center.  Groundwater surrounding these

facilities is used for, among other things, private wells supplying drinking water.

50.    Investigations at the FAA Technical Center have also revealed significant AFFF Products-related groundwater contamination.   Groundwater samples collected in a former firefighting training area included concentrations of PFOS up to 95,000 ppt and PFOA up to 41,000 ppt.  The Atlantic City Municipal Utilities Authority ("ACMUA") maintains production wells on FAA Technical Center property, which have been impacted by this contamination.

51.    Investigation of AFFF Products-related contamination in groundwater in New Jersey is ongoing.

### Surface Water

52.    Surface waters are a critical ecological resource of New Jersey.  New Jersey's surface water—which includes all water in the State's lakes, streams, and wetlands—is a primary source of drinking water in the State.  Nearly half of New Jersey's population obtains its drinking water from surface water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

53.    Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

54.    The tourism and recreation industries, which are vital to the State's economy, are dependent on clean waters and beaches.

55.    Significant PFOS and PFOA contamination attributable to AFFF Products have been found in surface water used for fishing and recreation, as well as for drinking water supplies.

56.    In 2018, NJDEP released a study of 11 waterways in New Jersey concerning PFAS, titled *Investigation of Levels of Perfluorinated Compounds in New Jersey Fish, Surface Water, and Sediment* ("2018 Waterways Study").  Three surface water bodies surrounding and receiving

drainage from JB MDL—specifically, Little Pine Lake, Mirror Lake, and Pine Lake—were included in the 2018 Waterways Study. The results of the study showed significant injuries. Little Pine Lake, Mirror Lake, and Pine Lake had the highest concentrations of total PFAS (up to 279.5 ppt) and PFOS (up to 102 ppt) in the study.

57.     Additionally, AFFF Products-related contamination has reached surface water bodies serving as drinking water supplies. Surface water reservoirs that are the drinking water supplies for the ACMUA, for example, have numerous PFAS, and elevated levels of PFOS and PFOA.

58.     Investigation of AFFF Products-related contamination in surface water is ongoing.

## Sediments and Soils

59.     New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

60.     Sediments and soils are a critical component of New Jersey ecological resources.

61.     Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem. They provide a living substrate for submerged and emergent flora and support diverse invertebrate species, wading birds, and fish and shellfish populations.

62.     Sediments and soils serve as a long-term reservoir of PFAS, where PFAS are stored and released over time, impacting biota and increasing PFAS concentration in fish tissue and wildlife.

63.     PFOS contamination attributable to AFFF Products has been found in sediments. The 2018 Waterways Study found elevated concentrations of PFOS sediments in Little Pine Lake, Mirror Lake, and Pine Lake. PFOS in sediments, as well as surface water, increases PFOS concentrations in fish.

64.     Investigation of AFFF Products-related contamination in sediments and soils in New Jersey is ongoing.

**Biota**

65.     Biota, including the flora and fauna of the State, are critical ecological resources. New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world.  Approximately 15 percent of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species lists as endangered and an additional 32 that have already been extirpated.

66.     New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds.  Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers in the State each year.

67.     At least 17 percent of New Jersey's native vertebrate species and 24 percent of its native invertebrate species are at risk of extinction.  Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

68.     New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

69.     Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

70.     Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

71.     AFFF Products-related contamination has prompted NJDEP to issue consumption

advisories for various species of fish. Through the 2018 Waterways Study, consumption advisories were issued for yellow perch, largemouth bass, pumpkinseed, American eel, and bluegill sunfish in Little Pine Lake, Mirror Lake, and Pine Lake, based on concentrations of PFOS in fish tissue. PFOS concentrations in species at some locations was severe enough that NJDEP issued consumption advisories for the general population of once per year (*i.e.*, only one meal consisting of such fish over the course of a year). For sensitive subpopulations (*e.g.* infants, children, pregnant women, and nursing mothers), NJDEP issued "Do Not Eat" advisories for certain species (*i.e.*, no meals at all).

72.     Investigation of AFFF Products-related contamination in biota in New Jersey is ongoing.

## **FACTUAL ALLEGATIONS**

73.     AFFF is a fire suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

74.     AFFF contains PFAS, which are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms. The PFAS family includes PFOS and PFOA.

75.     3M's AFFF, created using an electrochemical fluorination process, contains PFOS and PFOA. The remaining Manufacturer Defendants' AFFF Products, created using a telomerization process, contain or break down into PFOA. On information and belief, AFFF Products manufactured by Manufacturer Defendants other than 3M is a fungible product and lacks traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Manufacturer Defendant. Due to this fungibility, it may not be possible to identify the original manufacturer of the AFFF Products released at any particular site. Any

inability of the Plaintiffs to identify the original manufacturer of the specific AFFF Products released into the State's natural resources in particular instances at particular sites is a result of the fungibility of the products, and not as a result of any action or inaction by the Plaintiffs.

76.     When used as intended during a firefighting event or training exercise, AFFF Products can cause hundreds, if not thousands, of gallons of foamy water laced with PFOS and/or PFOA to enter the environment in a variety of ways, including, but not limited to, through surface water and groundwater.

77.     Manufacturer Defendants advertised, offered for sale, and sold AFFF Products to the military as well as State government entities, counties, municipalities, local fire departments, and/or other governmental entities and quasi-governmental entities for use in New Jersey.

### PFOS and/or PFOA Released from Manufacturer Defendants' AFFF Products Harm New Jersey's Environment and Wildlife

78.     PFOS and PFOA have characteristics that have resulted in their extensive and persistent contamination of New Jersey's natural resources.

79.     PFOS and PFOA are Mobile.  Once introduced into the environment, PFOS and PFOA quickly spread because they easily dissolve in water and, thus, reach numerous water systems within the State.

80.     PFOS and PFOA are Persistent.  PFOS and PFOA persist in the environment indefinitely because their multiple fluorine-carbon bonds, which are exceptionally strong and stable, are resistant to metabolic and environmental degradation processes.

81.     PFOS and PFOA Bioaccumulate and Biomagnify.  Because PFOS and PFOA are very slowly excreted from individual organisms, ongoing low level exposure results in a build-up in body burden (*i.e.*, levels of PFOS and PFOA remaining within the body).  They also biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain.

18

82.    <u>PFOS and PFOA are toxic</u>.  They cause adverse impacts to the environment and animal and human health.

### PFOS and/or PFOA Released from Manufacturer Defendants' AFFF Products Harm New Jersey's Residents

83.    PFOS and PFOA are associated with a variety of adverse health effects in humans.

84.    PFOS exposure is associated with increases in serum lipids (*i.e.*, high cholesterol), decreases in antibody response to vaccines, increases in risk of childhood infections, and adverse reproductive and developmental effects, including pregnancy-induced hypertension and preeclampsia.

85.    PFOA exposure is associated with increases in serum lipids and certain liver enzymes (indicating liver damage), decreases in antibody response to vaccines, pregnancy-induced hypertension and preeclampsia, decreased birthweight, and testicular and kidney cancer.

86.    Fetuses and newborns are particularly sensitive to PFOS's and PFOA's toxicity. Further, exposures to newborns are higher (compared to other subpopulations) through breastmilk or prepared formula when drinking water is contaminated with PFOS and/or PFOA.

### Manufacturer Defendants' History of Manufacturing and Selling AFFF Products

87.    3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s.  In the 1960s, 3M used its fluorination process to develop AFFF.

88.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.  Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.  Buckeye began to manufacture, market, and sell AFFF in the 2000s.

89.     Arkema's predecessors supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s.  Ciba supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s.  Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s.  Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants used to manufacture AFFF.  Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used to manufacture AFFF.  Following Chemours' spin-off from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

90.     At varying times, AGC Chemicals, Clariant, and Old DuPont supplied fluorochemicals used to make AFFF.

91.     From the 1960s through 2001, the United States Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

92.     In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF.  3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environmental management."  3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk."  In communications with the U.S. Environmental Protection Agency ("EPA") at that time, 3M also stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention . . . ."

93.     After 3M exited the AFFF market, the remaining Manufacturer Defendants continued to manufacture and sell AFFF Products that contained PFOA and/or its precursors.

More recently, Manufacturer Defendants still in the AFFF Products market have moved to short-chain PFAS-based products.

94.    Manufacturer Defendants knew their customers warehoused large stockpiles of AFFF Products.  In fact, Manufacturer Defendants marketed their AFFF Products by touting its shelf-life.  Even after Manufacturer Defendants fully understood the toxicity of PFOS and PFOA—and their deleterious impacts when released directly into the environment through use and disposal of AFFF Products exactly as they had marketed it and intended that it be used—Manufacturer Defendants concealed the true nature of PFOS and PFOA.  While Manufacturer Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF Products that contained PFOS, PFOA, and/or their precursors.  Manufacturer Defendants further did not act to get their harmful products off the market.  Manufacturer Defendants did not warn public entities or others that, if they used AFFF Products with PFOS, PFOA, and/or their precursors, they would harm the environment, endanger human health, or incur substantial costs to investigate and clean up contamination of groundwater and other natural resources and to dispose of AFFF Products.

95.    Accordingly, for many years after the original sale of AFFF Products that contained PFOS, PFOA, and/or their precursors, these AFFF Products were still being applied directly to the ground and washed into sediments, soils and waters, harming the environment and endangering human health.  Manufacturer Defendants never instructed their customers that they needed to properly dispose of their stockpiles of AFFF Products or how to properly dispose of AFFF Products.

## MANUFACTURER DEFENDANTS KNEW, OR AT THE VERY LEAST SHOULD HAVE KNOWN, THAT THEIR AFFF PRODUCTS CONTAINING PFOS, PFOA, AND/OR THEIR PRECURSORS WERE HARMFUL TO THE ENVIRONMENT AND HUMAN HEALTH

### 3M Knew for Decades that the PFOS and PFOA in its AFFF were Toxic and Sought to Suppress Negative Information Regarding these Chemicals

96.    3M has known for decades that the PFAS, including PFOS and PFOA, contained in its AFFF are toxic and negatively impact the environment and human health.

97.    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

98.    3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment.  An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

99.    As early as 1963, 3M knew that its PFAS products were stable in the environment and did not degrade after disposal.

100.    By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

101.    By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life.  One study of 3M's fluorochemicals around this time had to be abandoned to avoid severe pollution of nearby surface waters.

102.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.  Since PFOA is not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.  This finding also alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying,

as those characteristics would explain the presence of PFOA in human blood.

103.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

104.    In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats.  All monkeys died within the first few days or weeks after being given food contaminated with PFOS.  The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

105.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.  A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

106.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.  At the time of the specialist's resignation in 1999, 3M continued its resistance.

107.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

108.    Also in 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M's employees.

109.    Despite its understanding of the hazards associated with the PFOS and PFOA in its products, 3M actively sought to suppress scientific research on the hazards associated with them, and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and

effects to human health, and the ecological risks of PFOS and PFOA.

110.    At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

111.    3M engaged in a variety of tactics to deceive others and to hide the negative effects of PFAS.  For example, Dr. Rich Purdy, a former Environmental Specialist with 3M, wrote a letter detailing:  (1) 3M's tactics to prevent research into the adverse effects of its PFOS; (2) 3M's submission of misinformation about its PFOS to the EPA; (3) 3M's failure to disclose substantial risks associated with its PFOS to the EPA; (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

112.    Despite all of its knowledge, when 3M announced it would phase outs its PFOS, PFOA, and related products (including AFFF), it falsely asserted "our products are safe," instead of fully disclosing the substantial threat posed by PFOS and PFOA.

113.    3M knew, or at the very least should have known, that its AFFF, in its intended use, would release PFOS and/or PFOA in such a way that would significantly threaten the environment and public health.  Such knowledge was accessible to 3M, but not to Plaintiffs until 3M's acts and omissions came to light and the State developed its own understanding of the toxicity of PFOS and PFOA.

**Remaining Manufacturer Defendants Knew, or at the Very Least
Should have Known, that PFOA Released from their AFFF Products
was Dangerous to the Environment and Human Health**

114. The remaining (non-3M) Manufacturer Defendants knew, or at the very least should have known, that in their intended and/or common use, their AFFF Products containing or breaking down into PFOA would harm the environment and human health.

115. The remaining Manufacturer Defendants knew, or at the very least should have known that, their AFFF Products released PFOA that would dissolve in water, reach water system across the State, resist degradation, bioaccumulate and biomagnify, and harm animal and human health due to their toxicity.

116. Information regarding PFOA as well as other PFAS like PFOS was readily accessible to each of the above-referenced Manufacturer Defendants for decades, and particularly Old DuPont, because each is an expert in the field of AFFF Products manufacture and/or the PFAS-containing materials needed to manufacture AFFF Products, and each has detailed information and understanding about the PFAS in AFFF Products. The State, by contrast, did not have access to such information.

**Old DuPont Knew for Decades that PFOA is Harmful to the Environment and
Human Health, but Concealed its Knowledge from
AFFF Products Users and Regulators**

117. Old DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

118. In 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor

the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.  This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.  As noted above, PFAS, including PFOS and PFOA, contain carbon and fluorine, and human exposure to these chemicals has been linked to elevated organic fluorine levels.

119.    By 1979, Old DuPont had data indicating that workers exposed to PFOA had a significantly higher incidence of health issues than unexposed workers.  Old DuPont did not report these data or the results of its worker health analyses to any government agency or community at that time.

120.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

121.    Not only did Old DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.  Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees.  Of the eight women in the study who worked with fluoropolymers, two-or twenty-five percent-had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

122.    Old DuPont reported to EPA, in March 1982, the results from a rat study showing PFOA crossing the placenta when present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

123.    While Old DuPont knew about PFOA's toxicity danger as early as the 1960s, Old DuPont was also aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.  No later than 1984, Old DuPont was aware that PFOA is biopersistent.

124.    Old DuPont held a meeting in 1984 to discuss the health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."  They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

125.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.  For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

126.    Despite all of its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks.  For example, in 2008, Old DuPont literature is quoted in an article on AFFF appearing in Industrial Fire World magazine, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

**Old DuPont Worked in Concert with other Manufacturer Defendants and the Firefighting Foam Coalition to Protect AFFF Products from Regulatory Scrutiny**

127.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.  National Foam, Kidde-Fenwal, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours, among others in the industry, were members of the FFFC ("FFFC Defendants").  Through their involvement in the FFFC, as well as a variety of

other trade associations and groups, FFFC Defendants shared knowledge and information regulating PFOA and its precursors released from AFFF Products.

128.    The FFFC Defendants worked together to protect AFFF Products from scrutiny, including by coordinating their messaging on PFOA's toxicological profile and their AFFF Products' contribution of PFOA into the environment.  All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning the truth about the harms of PFOA to the environment and human health.

129.    FFFC Defendants regularly published newsletters bolstering their AFFF Products. FFFC Defendants also regularly attended conferences.  These coordinated efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health.  They worked in concert to conceal known risks of their AFFF Products and the PFOA and its precursors contained therein from the government and public.  On information and belief, they either had an express or tacit understanding to conceal such risks.

130.    FFFC Defendants repeated the same message for years:  Only one PFAS chemical, PFOS, had been taken off the market.  Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

131.    Among other things, FFFC Defendants persuaded the EPA that their AFFF Products should be excluded from the EPA's enforceable consent agreement process related to PFOA and fluorinated telomer production by arguing that the products were not likely to be a source of PFOA in the environment.

132.    FFFC Defendants knew, however, that their messaging regarding their AFFF Products was false.  Each of the FFFC Defendants knew that PFOA was released from the use of their AFFF Products, and that PFOA presented a similar threat to the environment and public

health as that posed by PFOS.  While this was known to FFFC Defendants, it was not fully
understood by the public and regulators, including Plaintiffs.

**AFFF PRODUCTS HAVE RESULTED IN PFOS AND PFOA CONTAMINATION IN
NEW JERSEY, AND AS FURTHER INVESTIGATION CONTINUES,
WIDESPREAD CONTAMINATION AND INJURIES TO
NATURAL RESOURCES WILL BE UNCOVERED**

133.    New Jersey's natural resources have been contaminated with PFOS and PFOA
through the transport, storage, use, handling, release, spilling, and/or disposal of AFFF Products.
Investigation of PFOS and PFOA contamination related to AFFF Products has only recently begun
in New Jersey.  Manufacturer Defendants' design, manufacturing, marketing, and sales of AFFF
Products throughout the United States, including in New Jersey, have been a substantial factor in
causing injuries to the natural resources of New Jersey due to PFOS and PFOA contamination.
Major sites of contamination have already been identified.  As investigation continues, additional
sites are identified, and on- and off-site AFFF Products-related contamination is delineated, it is
expected that widespread contamination from use, handling, and storage of AFFF Products will be
uncovered.

134.    JB MDL is among those sites already identified.  JB MDL spans 42,000 acres and
houses the combined operations of McGuire Air Force Base, Fort Dix, and Naval Engineering
Station Lakehurst.  Decades of AFFF Products use at locations on JB MDL has demonstrably
contaminated natural resources on and around the joint base, including groundwater, surface water,
sediment, and biota.  The results of NJDEP's 2018 Waterways Study has provided an initial
understanding of the off-site injuries caused by AFFF Products-related activities on the joint base.

135.    With respect to on-site contamination, sampling in 2016 of 21 areas across the joint
base revealed significant contamination of groundwater and surface water, with groundwater

monitoring wells showing combined levels of PFOS and PFOA as high as 264,300 ppt, and surface water showing combined levels as high as 8,830 ppt.

136.    Off-site, the Department of Defense has done limited sampling of drinking water supplies, which revealed that there were three private drinking water wells near the base with combined levels of PFOS and PFOA over 70 ppt, ranging from 152 ppt to 1,688 ppt.

137.    NJDEP's 2018 Waterways Study revealed significant damage to Little Pine Lake, Mirror Lake, and Pine Lake as a result of AFFF Products use on the joint base. Little Pine Lake receives drainage from the western edge of JB MDL; Mirror Lake receives drainage from the central area of JB MDL; Pine Lake receives drainage from the northern portion of JB MDL.

138.    <u>Little Pine Lake</u>. Surface water from Little Pine Lake had the highest concentration of total PFAS of any surface water sampled as part of the 2018 PFAS waterways study, with a total concentration of 279.5 ppt. The largest component of this total PFAS concentration was PFOS at 100 ppt; the sample also included PFOA at 25.09 ppt. Sediment from Little Pine Lake also had the highest concentration of total PFAS in sediment in the study, at 30.93 nanograms/gram ("ng/g"). The largest component of this PFAS concentration in sediment was also PFOS, at 28.10 ng/g. Fish in Little Pine Lake also had elevated levels of PFOS, including yellow perch (average 118.60 ng/g), largemouth bass (average 73.67 ng/g), and pumpkinseed (average 31.80 ng/g). PFOS in yellow perch and largemouth bass was so severe that NJDEP issued advisories for these species recommending limiting consumption to once per year. NJDEP issued a consumption advisory for pumpkinseed of once per every three months. For sensitive subpopulations, NJDEP issued "Do Not Eat" advisories for the above-referenced species.

139.    <u>Mirror Lake</u>. Surface water at Mirror Lake had the second highest concentration of total PFAS in the waterways study, with a total PFAS concentration of 180.9 ppt, which

included PFOS of 72.9 ppt and PFOA of 13.2 ppt. Sediment from Mirror Lake had a total concentration of PFAS of 3.55 ng/g, mostly consisting of PFOS (which was 3.07 ng/g). Fish in Mirror Lake had elevated levels of PFOS, including the American eel (average of 33.73 ng/g), largemouth bass (average of 39.63 ng/g), and bluegill sunfish (average of 22.20 ng/g). NJDEP issued consumption advisories for the above-referenced species of once per three months, and "Do Not Eat" advisories for sensitive subpopulations.

140.    Pine Lake.  Surface water at Pine Lake had the third highest concentration of total PFAS in the waterways study, with a total PFAS concentration of 170.7 ppt. However, Pine Lake had the highest concentration of any single PFAS in surface water, which was PFOS at 102 ppt. PFOA in surface water was 13.6 ppt. Similarly, Pine Lake had the highest concentration of PFOS in sediment, at 19.30 ng/g. Fish in Pine Lake had elevated levels of PFOS, including the American eel (average 162.5 ng/g), largemouth bass (114 ng/g), and pumpkinseed (119.2 ng/g). NJDEP issued once per year consumption advisories for the above-referenced species, and "Do Not Eat" advisories for sensitive subpopulations.

141.    The FAA Technical Center is another site with significant AFFF Products-related contamination.  The FAA Technical Center includes research facilities and a joint-civil military airport, and is located 10 miles northwest of Atlantic City. Additionally, the ACMUA's drinking water supplies, consisting of surface water reservoirs and public supply wells, is located on the property. Among other things, AFFF Products were used at the FAA Technical Center for various training exercises for airport firefighting personnel. As part of a 2009-2010 occurrence study of PFAS in raw water from public water systems, NJDEP collected samples from Doughty Pond (a/k/a Lower Reservoir) and Kuehnle Pond (a/k/a Upper Reservoir). Sampling showed various PFAS in the reservoirs, with high concentrations of total PFAS and elevated levels of PFOS (25

ppt in Doughty Pond, and 43 ppt in Kuehnle Pond) and PFOA (32 ppt in Doughty Pond, and 33 ppt in Kuehnle Pond).

142.    In 2014 and 2016, sampling of groundwater from a former fire training area at the FAA Technical Center, known as Area 29, revealed concentrations of PFOS and PFOA as high as 95,000 ppt and 41,000 ppt, respectively.  Investigation of PFOS and PFOA contamination at the site, including its effect on surface water and groundwater serving as drinking water supplies, is ongoing.

143.    There are also two Navy bases where use of AFFF Products has contaminated the site and is impacting surrounding private wells.  At Naval Weapons Station Earle, nine on-base groundwater monitoring wells revealed combined levels of PFOS and PFOA above 70 ppt, ranging from 75 ppt to 2,900 ppt.  At least two off-site nearby private wells also had combined levels above 70 ppt, and others have elevated levels of PFOS and/or PFOA.  At the former Naval Air Warfare Center in Trenton, 23 of 38 on-base groundwater monitoring wells revealed combined levels of PFOS and PFOA above 70 ppt, ranging from 178 ppt to 27,800 ppt.  At least one off-site groundwater monitoring well sampled revealed a combined PFOS and PFOA level of 112 ppt. Limited sampling at the Navy bases, as well as the use of higher criteria for sampling by the Department of Defense, only provides a limited understanding of the extent of contamination around these sites.

144.    As investigation of AFFF Products-related contamination continues, additional military and industrial facilities, airports, and fire training academies will be uncovered as contamination sites, impacting not only the immediate area, but surrounding areas, as well.  Such investigation is necessary to ascertain the scope of AFFF Products-related contamination and to return the natural resources impacted to levels that are safe for human health and the environment

as well as to the condition they were in prior to the impact of these contaminants.  Manufacturer

Defendants are liable for the cost of such investigation and restoration.

**OLD DUPONT'S THREE-STEP FRAUDULENT SCHEME TO**
**ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM**
**ITS PFAS LIABILITIES AND HINDER CREDITORS**

145.    Old DuPont and Chemours have substantial liabilities due to their polluting

activities.  Old DuPont's and Chemours' liabilities for PFOA and other PFAS contamination

account for a substantial portion of their environmental liabilities nationwide, and therefore affect

their overall ability to satisfy their environmental liabilities related to use of AFFF Products in

New Jersey.

146.    These liabilities include remediation obligations, tort damages, natural resource

damages, and, most importantly, likely massive and potentially crippling punitive damages arising

from Old DuPont's intentional misconduct.

147.    Old DuPont sought to insulate itself from billions of dollars of legacy pollution

liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants

that it owned and operated throughout the country.

148.    On information and belief, Old DuPont's potential cumulative liability related to

PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bio-

accumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's

decades-long attempt to hide the dangers of PFAS from the public.

149.    For more than five decades, Old DuPont manufactured, produced, or utilized PFOA

and other PFAS at plants in New Jersey, West Virginia, and North Carolina.  As alleged above,

throughout this time, Old DuPont was  aware that PFOA was toxic, harmful to animals and

humans, bioaccumulative, and biopersistent in the environment.  Old DuPont also knew that it had

emitted and discharged PFOA and other PFAS in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which Old DuPont had contaminated.  Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

150.    For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination adjacent to Old DuPont's Washington Works plant in Parkersburg, West Virginia, sued Old DuPont in West Virginia federal court.

151.    Old DuPont's in-house counsel was very concerned about Old DuPont's exposure related to PFOA.  In November 2000, one of Old DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head.  Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . .  Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

152.    In 2005, after confidentially settling the *Tennant* case, Old DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act.  Old DuPont also was required to commit an additional $6.25 million to supplemental environmental projects.  *See* https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

153.     Also, in 2005, Old DuPont agreed to settle a class action lawsuit filed on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works for $343 million.  Under the terms of the settlement, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.  The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

154.     After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

155.     More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia as part of the 2005 settlement.  These claims were consolidated in the federal multidistrict litigation styled *In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio.  Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

156.     Old DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, including in New Jersey, and that its liability was likely billions of dollars.

157.     In light of this significant exposure, on information and belief, by 2013, Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had

caused and shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

158.    On information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures.  In that connection, in or about 2013, Old DuPont and The Dow Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

159.    On information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS and environmental liabilities that Old DuPont faced.

160.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

161.    Old DuPont engaged in a three-part restructuring plan.

162.    The first step in Old DuPont's plan was to transfer its performance chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours.  And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

163.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours

Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

164.    Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades-long bad conduct with regard to the environment and PFAS.

165.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger.  Old DuPont and Old Dow became subsidiaries of DowDuPont.

166.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

167.    The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

168.    The third step involved DowDuPont spinning off two, new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow.  DowDuPont was then renamed DuPont de Nemours, Inc. (*i.e.*, New DuPont).

169.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or approximately one-half.

170.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

171.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements.  On information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

## THE THREE STEPS IN DETAIL

### Step 1: The Chemours Spinoff

172.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

173.    On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

174.    Prior to July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity.

175.    At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Flourochemicals segments.

176.    The Performance Chemicals Business included the business units that had manufactured, used, and discharged PFOA into the environment.

177.    Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

178.    On June 19, 2015, a fourth member of the Board was appointed, and on information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

179.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members.  The three initial Old DuPont employees resigned from the Board, and seven new members were appointed to fill the vacancies.

180.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

181.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

182.    Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff to ensure the transfer of all of its Performance Chemicals Business assets to Chemours.

183.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment.  The specific details regarding the nature and value of probable maximum loss, and anticipated timing of the liabilities that Chemours assumed are set forth in the non-public schedules and exhibits to the Chemours Separation Agreement.

184.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

185.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

186.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future environmental and PFAS claims, and Old DuPont stripped Chemours' value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. The Chemours Separation Agreement also required Chemours to assume billions of dollars of Old DuPont's PFAS liabilities and includes an indemnification of Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

187.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

188.    Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff;

(iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

189.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

190.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

191.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated, and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

192.    There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

193.    In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff.  Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated,

Chemours did not have an independent board of directors or management independent of Old DuPont.

194.    Chemours' independent board, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

195.    It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and, in so doing, shield Old DuPont.

196.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont.  Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

197.    Indeed, shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

198.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion.  At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

199.    Removing Chemours' Goodwill and Other Intangibles of $176 million, which were reported at that time, yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets).

200.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation.  Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

201.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

202.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant.  Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.  For all future PFOA costs incurred from July 6, 2017 through July 6, 2022, Chemours agreed to cover the first $25 million per 12-month period, Old DuPont agreed to cover the next $25 million per 12-month period, and Chemours agreed to cover any additional amounts. Chemours is a named defendant in many lawsuits relating to Old DuPont's historical use of PFAS and other contaminants.

203.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, Chemours would have been rendered insolvent at that time.

## Step 2: The Old Dow/Old DuPont "Merger"

204.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.  Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals Business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

205.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and Chemours had assumed.

206.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages.  So Old DuPont moved to the next phase of its fraudulent scheme.

207.    On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger").  The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

208.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for: (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then

renamed DuPont de Nemours, Inc., *i.e.*, "New DuPont," and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

209.    Thus, as a result of the Merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

210.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities.  Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont.

211.    The below image reflects the corporate organization following the "merger":



**Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow**

212.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and

"divestitures."   The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

213.    While, again, the details of these transactions remain hidden from the State and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.  The significant internal reorganization instituted by DowDuPont was in preparation for the conglomerate being split into three separate, publicly traded companies.

214.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Material Sciences Business."

215.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

216.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business.  DowDuPont retained the Specialty Products Business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

217.    The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



218.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow and DowDuPont (the "DowDuPont Separation Agreement").

219.    The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively.  New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

220.    Similarly, Corteva, New Dow and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the

liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

221.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, on information and belief, the PFAS liabilities.  These assumed PFAS liabilities are allocated on a *pro rata* basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

222.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State of New Jersey's claims in this case.

223.    While New DuPont and Corteva have buried the details in non-public schedules, on information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses.  The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the State's natural resources.

224.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a *pro rata* dividend.  New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

225.    On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva.

The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

226.     Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now trades on the NYSE under the stock ticker "CTVA."

227.     The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a *pro rata* dividend.

228.     The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



229.     Also on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (*i.e.*, New DuPont).

**The Effect of the Years-Long Scheme to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

230.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont, and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

231.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars.  When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet.  But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

232.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion.  Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

233.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities.  For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities.  That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

234.    Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT").  Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014.  For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

235.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation.  For the fiscal year ended 2014, prior to the Chemours Spinoff, Old

DuPont owned nearly $41 billion in tangible assets.  For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

236.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

237.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

238.    At the same time, Old DuPont reported liabilities totaling $22.060 billion.  Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

239.    Old DuPont's financial condition has continued to deteriorate.  By the fiscal year ended 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets.  Old DuPont's reported liabilities for the same period totaled $21.869 billion.

240.    Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, ending fiscal year 2019 with tangible net worth of negative $1.125 billion.

241.    In addition, the State cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva.  Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities.  And it is far from clear that either entity will be able to satisfy future judgments.

242.    Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of

divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

243.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

244.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

245.    On December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

246.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

247.    In addition, New DuPont has issued Notices of Intent to Sell relating to: six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

248.    Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont.  But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

**<u>FIRST COUNT</u>**
**Strict Products Liability—Design Defect**

249.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

250.     Manufacturer Defendants designed, manufactured, marketed, and sold AFFF Products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed in New Jersey during the relevant period.

251.     As designers, manufacturers, marketers, and sellers of AFFF Products, Manufacturer Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.  Manufacturer Defendants owed that duty both to reasonably foreseeable users of their products and also to any person or property that might reasonably be expected to come into contact with those products.

252.     Manufacturer Defendants' AFFF Products containing PFOS, PFOA, and/or their precursors were used in a reasonably foreseeable manner and without substantial change in the condition of such products.  These products were defective and unfit for their reasonable use. Manufacturer Defendants' AFFF Products foreseeably contaminated groundwater, surface water, sediments, soils, biota, and other natural resources at and around the sites where they were used. Manufacturer Defendants knew or reasonably should have known that their manufacture, marketing, and/or sale, as well as their customers' transport, storage, use, handling, release, spilling and/or disposal of AFFF Products in an intended or reasonably foreseeable manner, would result in the release of PFOS and PFOA in the environment, including at various locations in New Jersey.

253.     AFFF Products containing PFOS, PFOA, and/or their precursors used at various sites in New Jersey have injured and are continuing to injure groundwater, surface water, sediments, soils, biota, and other natural resources at and/or around these sites.  Manufacturer Defendants' AFFF Products were defective in design and unreasonably dangerous because, among other things:

1) Manufacturer Defendants' AFFF Products cause extensive and persistent PFOS and PFOA contamination when used in a reasonably foreseeable and intended manner;

2) PFOS and PFOA released into the environment from Manufacturer Defendants' AFFF Products cause contamination in groundwater and surface water that are the sources of drinking water and pose significant threats to public health and welfare; and

3) Manufacturer Defendants failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFOS and PFOA.

254.    At all times relevant to this action, the AFFF Products that Manufacturer Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

255.    At all times relevant to this action, the foreseeable risk to the environment and public health and welfare posed by Manufacturer Defendants' AFFF Products containing PFOS, PFOA, and/or their precursors outweighed the cost to Manufacturer Defendants of reducing or eliminating such risk.

256.    At all times relevant to this action, Manufacturer Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF Products, and the omission of such alternative designs rendered their AFFF Products not reasonably safe.  While Manufacturer Defendants have recently transitioned to short-chain PFAS-based AFFF Products, which they claim are safer, they could have made this transition earlier.  Moreover, AFFF Products can be designed with fluorine-free compounds, which do not contain or break down into PFAS.

257.    As a direct and proximate result of the defects in Manufacturer Defendants' design, manufacture, marketing, and sale of AFFF Products containing PFOS, PFOA, and/or their precursors, groundwater, surface water, sediments, soils, biota and other natural resources at and/or near the various sites throughout New Jersey where the AFFF Products were used have become contaminated with PFOS and/or PFOA, causing the State and its citizens significant injury and damage.

258.    As a direct and proximate result of Manufacturer Defendants' acts and omissions, as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages in an amount to be proved at trial related to PFOS and PFOA contamination of groundwater, surface water, sediment, soils, biota, and other natural resources at and/or near the various sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed.

259.    As a further direct and proximate result of Manufacturer Defendants' acts and omissions alleged in this First Amended Complaint, Plaintiffs have incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface waters, sediments, soils, biota, and other natural resources at and/or near the various sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed, for which Manufacturer Defendants are strictly, jointly, and severally liable.

260.    Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause the contamination and harms described herein.

261.    This suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

262.    Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

263.    Manufacturer Defendants are strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

264.    On information and belief, New DuPont and Corteva assumed Old DuPont's design defect liability described above.

## PRAYER FOR RELIEF

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

a.    Finding Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1)    Past and future testing of natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed, and thus likely caused PFOS and/or PFOA contamination;

    2)    Past and future treatment of all natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

    3)    Past and future monitoring of the State's natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

b.    Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Manufacturer Defendants' AFFF Products;

c.    Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Manufacturer Defendants' AFFF Products;

d.    Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Manufacturer Defendants' AFFF Products of such natural resources;

e.    Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

f.    Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused at and around sites within the State;

g.    Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

h.    Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.    Awarding Plaintiffs such other relief as this Court deems appropriate.

## SECOND COUNT
### Strict Products Liability—Failure to Warn

265.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

266.    As designers, manufacturers, marketers, and sellers of AFFF Products containing PFOS, PFOA, and/or their precursors, Manufacturer Defendants had a strict duty to the State and to those who were at risk of being harmed by AFFF Products to warn users of those products and the State of the foreseeable harms associated with them.

267.    Manufacturer Defendants had a duty to warn the State about the dangers of their AFFF Products because, among other things, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; because NJDEP is charged with enforcing the State's environmental laws and regulations; and because the State maintains a "quasi-sovereign" interest in the well-being of its residents.

268.    Manufacturer Defendants inadequately warned of the likelihood that PFOS and/or PFOA would be released into the environment during the normal use of Manufacturer Defendants' AFFF Products, and of the widespread, toxic, and persistent effects of such releases.  Manufacturer Defendants failed to provide such warnings to (i) users and buyers of their AFFF Products containing PFOS, PFOA, and/or their precursors, (ii) the State, and (iii) others to which it was reasonably foreseeable Manufacturer Defendants' AFFF Products would cause harm.  To the extent Manufacturer Defendants provided any warnings about their products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by AFFF Products containing PFOS, PFOA, and/or their precursors, and the warnings did not convey adequate information on the dangers of AFFF Products containing these chemicals to the mind of a reasonably foreseeable or ordinary user or bystander.

269.    Despite the fact that Manufacturer Defendants knew or should have known about the risks of AFFF Products containing PFOS, PFOA, and/or their precursors, Manufacturer Defendants withheld such knowledge from Plaintiffs, regulators, and the public.  Moreover, Manufacturer Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers they pose.

270.    At no time relevant to this action did Manufacturer Defendants warn users and buyers of their AFFF Products, the State, and others who it was reasonably foreseeable would be harmed by AFFF Products, that Manufacturer Defendants' AFFF Products would release PFOS and/or PFOA into the environment during the products' normal use, and of the widespread, toxic, and persistent effects of such releases.

271.    Manufacturer Defendants' AFFF Products were in the same condition when they were purchased and/or used as they were when they left Manufacturer Defendants' control. Manufacturer Defendants' customers used the AFFF Products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

272.    Had Manufacturer Defendants provided adequate warnings about the hazards associated with their AFFF Products containing PFOA, PFOS, and/or their precursors, users and buyers, the State, and others who it was reasonably foreseeable would be harmed by the AFFF Products would have heeded those warnings.

273.    As a direct and proximate result of Manufacturer Defendants' failure to warn of the hazards of AFFF Products containing PFOS, PFOA, and/or their precursors, groundwater, surface water, sediments, soils, biota, and other natural resources at and around various sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed have become contaminated with PFOS and PFOA.

274.    As a direct and proximate result of Manufacturer Defendants' acts and omissions, NJDEP has incurred, is incurring, and will continue to incur in the future damages related to PFOS and PFOA contamination in an amount to be proved at trial.

275.    Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause the State's injury and damage.

276.    This suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

277.    Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

278.    Manufacturer Defendants are strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

279.    On information and belief, New DuPont and Corteva assumed Old DuPont's failure to warn liability described above.

## PRAYER FOR RELIEF

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

a.    Finding Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1)    Past and future testing of natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed, and thus likely caused PFOS and/or PFOA contamination;

2)    Past and future treatment of all natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed

and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

3)      Past and future monitoring of the State's natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

b.      Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Manufacturer Defendants' AFFF Products;

c.      Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Manufacturer Defendants' AFFF Products;

d.      Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Manufacturer Defendants' AFFF Products of such natural resources;

e.      Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

f.      Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused at and around sites within the State;

g.    Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

h.    Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.    Awarding Plaintiffs such other relief as this Court deems appropriate.

**THIRD COUNT**
**Negligence**

280.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

281.    Manufacturer Defendants had a duty to the State to ensure that PFOS and/or PFOA were not released as a result of the transport, storage, use, handling, release, spilling and/or disposal of their AFFF Products, and did not injure groundwater, surface water, sediment, soils, and biota in New Jersey.

282.    Manufacturer Defendants had a duty to the State to exercise due care in the design, manufacture, marketing, sale, testing, labeling, and instructions for use of their AFFF Products containing PFOS, PFOA and/or their precursors.

283.    Manufacturer Defendants breached these duties.

284.    As a direct and proximate result of Manufacturer Defendants' negligence in designing AFFF Products and in failing to warn AFFF Products purchasers, the State, and others who it was reasonably foreseeable would be harmed by the dangers of Manufacturer Defendants' AFFF Products, groundwater, surface water, sediments, soils, biota, and other natural resources at and around various sites throughout New Jersey where Manufacturer Defendants' AFFF Products

were transported, stored, used, handled, released, spilled, and/or disposed have become contaminated with PFOS and PFOA.

285.    As a further direct and proximate result of the contamination of the environment from Defendant's AFFF Products containing PFOA, PFOS, and/or their precursors, NJDEP has incurred, is incurring, and will continue to incur investigation, clean up and removal, treatment, monitoring and restoration costs, and expenses for which Manufacturer Defendants are jointly and severally liable.

286.    Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

287.    On information and belief, New DuPont and Corteva assumed Old DuPont's negligence liability described above.

## PRAYER FOR RELIEF

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

a.    Finding Defendants liable for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and

for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, released, spilled, and/or disposed, and thus likely caused PFOS and/or PFOA contamination;

2) Past and future treatment of all natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

b. Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Manufacturer Defendants' AFFF Products;

c. Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Manufacturer Defendants' AFFF Products;

d.  Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Manufacturer Defendants' AFFF Products of such natural resources;

e.  Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f.  Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused at and around sites within the State;

g.  Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

h.  Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.  Awarding Plaintiffs such other relief as this Court deems appropriate.

## FOURTH COUNT
### Public Nuisance

288.    Plaintiffs repeat each of the allegations in the paragraphs above as if fully set forth in their entirety herein.

289.    Groundwater, surface water, sediments, soils, and biota are natural resources of the State held in trust by the State.

290.    The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

291.    The contamination of the groundwater, surface water, sediment, soils, and biota at and around the various sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed constitutes a physical invasion of the State's natural resources, and on information and belief, the State's real property in the vicinity of these sites, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the NJDEP, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

292.    As long as these natural resources at and around these various sites throughout New Jersey contaminated by Manufacturer Defendants' AFFF Products remain contaminated due to Manufacturer Defendants' conduct, the public nuisance continues.

293.    Until these natural resources are restored to their pre-injury quality, Manufacturer Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

294.    Manufacturer Defendants marketed AFFF Products to their customers, including New Jersey governmental entities, knowing that the use of their AFFF Products—used exactly as marketed for intended use—would create a public nuisance.  Likewise, well after the Manufacturer Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFOS and PFOA in the environment, Manufacturer Defendants never instructed their customers, including New Jersey governmental entities, to stop applying the AFFF Products in their possession or that

they needed to specially dispose of AFFF Products so as to not further contaminate the natural resources of the State.

295.    Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

296.    On information and belief, New DuPont and Corteva assumed Old DuPont's nuisance liability described above.

## PRAYER FOR RELIEF

**WHEREFORE**, NJDEP requests that this Court enter judgment against Defendants as follows:

a.    Ordering Defendants to reimburse NJDEP for its costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so that such natural resources are restored to their original condition;

b.    Compelling Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of the State's natural resources at and around the sites throughout New Jersey where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so that such natural resources are restored to their original condition;

c. Compelling Defendants to pay special damages to NJDEP, funding its performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the transport, storage, use, handling, release, spilling, and/or disposal of Manufacturer Defendants' AFFF Products, and compelling Defendants to compensate the citizens of New Jersey, for the costs of restoration and replacement, including lost use and value of any injured natural resource;

d. Awarding Plaintiffs punitive damages in an amount to be determined by the tier of fact;

e. Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

f. Awarding Plaintiffs such other relief as this Court deems proper.

## FIFTH COUNT
### Consumer Fraud Act

297. Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

298. The CFA prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . .

299. The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

300.    The AFFF Products advertised, offered for sale, and sold by Manufacturer Defendants comprise merchandise within the meaning of the CFA.

301.    Manufacturer Defendants advertised, offered for sale, and sold AFFF Products to New Jersey State government entities, counties, municipalities, local fire departments, and/or other New Jersey governmental entities.

302.    New Jersey State government entities, counties, municipalities, and local fire departments are consumers entitled to protection under the CFA.

303.    Manufacturer Defendants, in the course of advertising, offering for sale, and selling AFFF Products, have engaged in unconscionable commercial practices, deception, misrepresentations, and/or knowing omissions of material fact in violation of the CFA.

304.    Manufacturer Defendants have engaged in unconscionable commercial practices and deception, including, but not limited to, the following:

a.    Selling AFFF Products to New Jersey State government entities, counties, municipalities, local fire departments, and/or other New Jersey governmental entities, despite knowing that use of the AFFF Products would result in PFOS and/or PFOA contamination, and thus burdening these entities with costs of investigation, clean up, and disposal of existing stockpiles.

b.    Despite knowing the dangers associated with PFOS and PFOA, withholding this knowledge from New Jersey State government entities, counties, municipalities, local fire departments, and other New Jersey governmental entities, such that these entities did not understand the full consequences of their use of AFFF Products.

c.    Deceptively claiming that their AFFF Products were safe and/or did not present a threat to the environment or human health.

305.    Manufacturer Defendants have made misrepresentations, including, but not limited to, representing that AFFF Products were safe and did not pose a threat to the environment or human health, when such was not the case.

306.    Manufacturer Defendants have engaged in the knowing omissions or concealments of material facts, including, but not limited to the following:

a.    Omitting or concealing material facts regarding the mobile, persistent, bioaccumulative, and toxic nature of PFOS and PFOA;

b.    Omitting or concealing material facts regarding the effect of using Manufacturer Defendants' AFFF Products on the environment and human health.

307.    Each unconscionable commercial practice, act of deception, misrepresentation, and/or knowing omission of fact by Manufacturer Defendants constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

308.    On information and belief, New DuPont and Corteva assumed Old DuPont's CFA liability described above.

## PRAYER FOR RELIEF

**WHEREFORE**, the Attorney General and the Director request that this Court enter judgment against Defendants as follows:

a.    Finding that the acts, practices and omissions of Defendants constitute multiple violations of the CFA, N.J.S.A. 56:8-1 to -210;

b.    Permanently enjoining Defendants and their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, corporations, subsidiaries, affiliates, successors, assigns, and all other persons or entities directly under their control, from engaging in,

continuing to engage in, or doing any of the acts or practices in violation of the CFA, N.J.S.A. 56:8-1 to -210, including, but not limited to, the acts and practices alleged in this First Amended Complaint, as authorized by the CFA, specifically N.J.S.A. 56:8-8;

c.      Directing Defendants to disgorge all funds and property (real and personal) acquired and/or retained as a result of any acts or practices in violation in violation of the CFA, as authorized by N.J.S.A. 56:8-8;

d.      Directing Defendants to restore to any affected New Jersey State government entities, counties, municipalities, local fire departments, and other New Jersey governmental entities, any money or real or personal property acquired by means of any practice alleged herein to be unlawful and found to be unlawful, as authorized by N.J.S.A. 56:8-8;

e.      Directing Defendants to pay the maximum statutory civil penalties, for each and every violation of the CFA, pursuant to N.J.S.A. 56:8-13;

f.      Directing Defendants to pay costs and fees, including attorneys' fees, for use of the State, pursuant to N.J.S.A. 56:8-11 and -19; and

g.      Granting Plaintiffs such other relief as the interests of justice may require.

### SIXTH COUNT
**Actual Fraudulent Transfer In Relation to Chemours Spinoff – As Against Old DuPont, Chemours, Corteva, and New DuPont**

309.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

310.    Plaintiffs are and were creditors of Chemours at all relevant times.

311.    Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours

Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

312.    The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

313.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

314.    Chemours made the Chemours Transfers and incurred the Chemours Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours.

315.    Plaintiffs have been harmed as a result of the Chemours Transfers.

316.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

317.    On information and belief, Corteva and New DuPont assumed Old DuPont's liability for the actual fraudulent transfers described above.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont and Chemours, Corteva, and New DuPont as follows:

a.    Voiding the Chemours Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.    Awarding Plaintiffs such other relief as this Court deems appropriate.

**SEVENTH COUNT**
**Constructive Fraudulent Transfer in Relation to Chemours Spinoff – As Against Old DuPont, Chemours, Corteva, and New DuPont**

318.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

319.    Plaintiffs are and were creditors of Chemours at all relevant times.

320.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

321.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

322.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

323.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

324.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

325.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

326.    Plaintiffs have been harmed as a result of the Chemours Transfers.

327.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

328.    On information and belief, Corteva and New DuPont assumed Old DuPont's liability for the constructive fraudulent transfers described above.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Corteva, and New DuPont as follows:

a.    Voiding the Chemours Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.    Awarding Plaintiffs such other relief as this Court deems appropriate.

## EIGHTH COUNT
**Actual Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations – As Against Old DuPont, New DuPont, and Corteva**

329.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

330.    Plaintiffs are and were creditors of Old DuPont at all relevant times.

331.    Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

332.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

333.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

334.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

335.    Plaintiffs have been harmed as a result of the Old DuPont Transfers.

336.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiffs that have been damaged as a result of the actions described in this First Amended Complaint.

337.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Old DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, New DuPont, and Corteva as follows:

a.    Voiding the Old DuPont Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs;

c.    Enjoining New DuPont from selling, distributing, transferring, capitalizing, or otherwise disposing of the business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and/or imposing a constructive trust over the proceeds of any such transactions for the benefit of Plaintiffs; and

d.    Awarding Plaintiffs such other relief as this Court deems appropriate.

**NINTH COUNT**
**Constructive Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations – As Against Old DuPont, New DuPont, and Corteva**

338.    Plaintiffs repeat each of the allegations in the paragraphs above as though fully set forth in its entirety herein.

339.    Plaintiffs are and were creditors of Old DuPont at all relevant times.

340.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

341.    Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

342.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

343.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

344.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

345.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

346.    Plaintiffs have been harmed as a result of the Old DuPont Transfers.

347.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, New DuPont, and Corteva as follows:

a.    Voiding the Old DuPont Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs;

c.    Enjoining New DuPont from selling, distributing, transferring, capitalizing, or otherwise disposing of the business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and/or imposing a constructive trust over the proceeds of any such transactions for the benefit of Plaintiffs; and

d.    Awarding Plaintiffs such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

Dated:  September 25, 2020

**GURBIR S. GREWAL**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorney for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Ph. (609) 376-2761

**KELLEY DRYE & WARREN LLP**
*Special Counsel to the Attorney General*

By: */s/ William J. Jackson*
William J. Jackson, Esq.
Also by: John D.S. Gilmour, Esq.
515 Post Oak Blvd. Suite 900

Houston, Texas 77027
Ph. (713) 355-5000

Also by: David I. Zalman, Esq.
        Martin A. Krolewski, Esq.
        David M. Reap, Esq.
101 Park Avenue
New York, New York 10178
Ph. (212) 808-7800

**COHN LIFLAND PEARLMAN**
 **HERRMANN & KNOPF LLP**
*Special Counsel to the Attorney General*

By: Leonard Z. Kaufmann, Esq.
    Joseph A. Maurice, Esq.
    Christina N. Stripp, Esq.
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Ph. (201) 845-9600

**LAW OFFICES OF JOHN K. DEMA, P.C.**
*Special Counsel to the Attorney General*

By: John K. Dema, Esq.
    Scott E. Kauff, Esq.
    John T. Dema, Esq.
    James Crooks, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Ph. (340) 773-6142